LOWENTHAL et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 9532.

Circuit Court of Appeals Seventh Circuit.

July 21, 1948.

Rehearing Denied Sept. 24, 1948.

Max Bloomstein, Jr., and Gilbert H. Hennessey, both of Chicago, Ill., (Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., of counsel), for petitioner.

Theron L. Caudle, Asst. Atty. Gen., Sewall Key, George A. Stinson, Helen Goodner and Melva M. Graney, Asst. Atty. Gen., and Charles Oliphant and John M. Morawski, Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

These are petitions by Eli Roy Lowenthal and Sol G. Cogan for review of separate decisions of the Tax Court, entered June 26, 1947, determining deficiencies in the income tax of each of the petitioners for the years 1940 and 1941. The petitions have here been consolidated for hearing and decision. A third petitioner before the Tax Court, William Shapiro, who also received an adverse decision, has not here filed a petition for review. (Before this court, Lowenthal and Cogan are referred to as petitioners, while they, together with Shapiro, are sometimes referred to as the taxpayers.)

The deficiency determined by the Tax Court in the income tax of Cogan was $2,154.12 for the year 1940 and $5,066.37 for the year 1941, and in the income tax of Lowenthal, $1,298.43 for the year 1940 and $4,804.93 for the year 1941. The deficiencies for the year 1940 were predicated upon a transaction by which the Manheimer Watch Company, an Illinois corporation (hereinafter referred to as the corporation), acquired 68 shares of its common stock from each of the taxpayers at a price of $155.40 per share, or $10,567.20 for each. The deficiencies for 1941 were predicated upon a similar transaction by which the corporation on April 17, 1941 acquired 76.5 shares of its common stock from Lowenthal at $155.40 per share, or $11,888.10, and 76 shares of such stock, each from Cogan and Shapiro at $155.40 per share, or $11,810.40 for each.

The Tax Court in determining the deficiencies held that Sec. 115(g) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev. Code, § 115(g), was applicable to these transactions between the corporation and the taxpayers during the years 1940 and 1941. The primary issue before this court is whether the record affords substantial support for the Tax Court's finding that the distributions thus made by the corporation to petitioners in redemption of the corporation's stock were essentially equivalent to the distribution of taxable dividends within the meaning of the section referred to. Another issue raised by petitioners is that the Tax Court erred in striking certain evidence asserted to show an understanding or arrangement, the purpose and net effect of which were such as to preclude the applicability of Sec. 115(g).

The evidentiary facts as found by the Tax Court were based in the main upon a stipulation of the parties. The Manheimer Watch Company during the period here material was engaged in the business of distributing American manufactured watches under franchises from the Hamilton, Elgin and Waltham watch companies. It was well established and had an outstanding reputation. In the spring of 1939, Waltham changed its method of distribution in a manner which led the officers of the corporation to believe that it would lose a large percent of the volume of its Waltham business. To meet this situation, the corporation on May 6, 1939 organized the Hampden Watch Company, an Illinois corporation, as a wholly owned subsidiary. Hampden was to import Swiss watch movements and sell them to customers which the corporation expected to lose as a result of the change in Waltham's merchandising policy. This action was characterized by the parties as sub rosa due to the attitude of American watch manufacturers toward competition by foreign products.

By the fall of 1939, it developed that the corporation would be in danger of losing its franchise with Waltham should its connection with Hampden and its activities be discovered. Arthur Manheimer, president of the corporation, decided he would take the business represented by Hampden and sever his connections with the corporation.

The authorized capital of the corporation on December 31, 1939 consisted of 500 shares of preferred stock of a par value of $100 per share, and 1,500 shares of common stock of a par value of $100 per share. On February 5, 1940, the 1295.5 shares of outstanding common stock of the corporation were owned as follows:

| Stockholders | No. of Shares | Percent |
|---|---|---|
| Arthur E. Manheimer.... | 725 | 55.963 |
| Abraham Greenspahn and Albert K. Orschel as Trustees of the Manheimer Trust .......... | 150 | 11.579 |
| William Shapiro ........ | 188 | 14.512 |
| Sol G. Cogan ............ | 110 | 8.491 |
| E. Roy Lowenthal ....... | 105.5 | 8.143 |
| Maurice Zimbler ........ | 17 | 1.312 |
| | 1295.5 | 100.00 |

On February 5, 1940, Mannheimer and the trustees transferred to the corporation a total of 219 shares of its common stock, Mannheimer transferring 183, and the trustees 36. They received as consideration all the stock of the Hampden Watch Company and the assignment of a $10,000 note of Hampden payable to the corporation March 19, 1940.

On February 6, 1940, petitioners and Shapiro entered into a written agreement with Manheimer and the trustees by which they purchased the remaining 656 shares owned by them for $155.40 per share, or a total of $103,962.40, of which amount the purchasers became obligated to pay the sellers $36,000 in cash on or before February 29, 1940, and the balance, plus interest, on or before January 15, 1941. Petitioners and Shapiro in February, 1940, paid Manheimer and the trustees the $36,000 ($12,000 each) as agreed, from their own funds but were unable individually to raise the necessary money to pay the balance due under the contract.

On the date of the execution of the contract, the 656 shares sold by Manheimer and the trustees to petitioners and Shapiro were delivered to the corporation for transfer and new certificates were issued by which Shapiro acquired 245 shares, Cogan 223 shares and Lowenthal 188 shares. A second written agreement was entered into on February 6, 1940, between the petitioners and Shapiro, by which the latter agreed to transfer to Cogan 20 shares and to Lowenthal 60 shares of the stock which Shapiro had purchased from Manheimer and the trustees. The transfer of these shares was made as agreed. After this transaction, the common stock of the company was owned as follows:

| | Shares | Percent |
|---|---|---|
| Cogan ................. | 353 | 32.8 |
| Shapiro ................. | 353 | 32.8 |
| Lowenthal ............. | 353.5 | 32.8 |
| Zimbler ................ | 17 | 1.6 |

For the purpose of paying the balance due to Manheimer and the trustees, as required by the written contract of February 6, 1940, petitioners and Shapiro withdrew $66,365.06 from the corporation as follows:

| | May 7, 1940 | October 25, 1940 | March 11, 1941 |
|---|---|---|---|
| Lowenthal .. | $ 4,500 | $ 5,500 | $12,492.45 |
| Cogan ..... | 5,000 | 5,000 | 11,862.92 |
| Shapiro .... | 5,500 | 4,500 | 12,009.69 |
| | $15,000 | $15,000 | $36,365.06 |

The amounts thus withdrawn were charged on the dates of withdrawal on the corporate books to the respective drawing accounts of petitioners and Shapiro. No formal corporate action authorized the withdrawals, no notes were executed to the corporation in connection therewith, and no security was furnished.

On October 25, 1940, there was surrendered to the corporation by Shapiro a certificate calling for 102 shares of stock, by Cogan a certificate calling for 80 shares, and by Lowenthal a certificate calling for 143 shares, and at the same time substitute certificates were issued to each calling for the same number of shares as had been surrendered.

This brings us to the immediate transaction which gives rise to the instant controversy. On December 27, 1940, the corporation acquired 68 shares of common stock

from each of the petitioners, as well as from Shapiro, or a total of 204 shares at $155.40 per share, or $10,567.20 for each party. This aggregated $31,701.60 for the 204 shares. A certificate calling for such number of shares was delivered by each of the parties to the corporation, which cancelled them at that time. A new certificate was issued in the name of the corporation for the number of shares thus acquired, that is, 204, which was carried on its books as treasury stock until August, 1942. On April 17, 1941, a similar transaction took place. At that time the corporation acquired 76 shares of common stock from Shapiro and Cogan, and 76.5 shares from Lowenthal, at $155.40 per share, being $11,810.40 for Shapiro and Cogan respectively, and $11,-888.10 for Lowenthal, or an aggregate of $35,508.90. Stock certificates were delivered by petitioners and Shapiro to the corporation, which cancelled them at that time. (It appears the certificates surrendered called for more shares than the corporation acquired and that new certificates were issued to petitioners and Shapiro for the difference. The details by which this was accomplished appear to be immaterial, and are omitted.)

After these shares were acquired by the corporation on April 17, 1941, its record showed its outstanding common stock was held as follows:

| Stockholders | No. of Shares | Percent |
|---|---|---|
| Cogan | 209 | 32.45 |
| Shapiro | 209 | 32.45 |
| Lowenthal | 209 | 32.45 |
| Zimbler | 17 | 2.64 |

There were also the 651.5 shares of common stock issued in the name of the corporation and carried on its books as treasury stock. The surrender of the stock certificates to the corporation on December 27, 1940 and April 17, 1941 was also handled informally. Petitioners and Shapiro decided when the corporation was in funds and then withdrew the necessary amounts to pay Manheimer and the trustees.

At the time the withdrawals were made on May 7, 1940, October 25, 1940, and March 11, 1941, petitioners and Shapiro did not expect to make cash repayments of the amounts withdrawn, but intended to have the debit balances in their respective drawing accounts eliminated by credits for an appropriate number of shares which would be surrendered to the corporation.

The amounts which were distributed to petitioners by the corporation on December 27, 1940 and April 17, 1941, on which dates they delivered their stock to the corporation, were based on their cost of $155.40 per share and not upon the book value of the stock. The debit balances in petitioners' respective drawing accounts prior to December 27, 1940 and prior to April 17, 1941, resulting from the withdrawals, were eliminated by the credits to the drawing accounts on those dates to give effect to the acquisition of petitioners' stock by the corporation. The amounts of such credits were substantially the same as the amounts of the previous withdrawals and resulted in the elimination of the debit balances arising from such withdrawals.

There was no intent to liquidate the corporation at the time petitioners' stock was acquired on December 27, 1940 and April 17, 1941. The business of the corporation was not liquidated thereafter and the corporation continued to do business. The stock acquired by the corporation from petitioners on December 27, 1940 and April 17, 1941, while acquired for retirement, was carried as treasury stock until August, 1942.

Cogan regarded the stock as retired as of the time the payments were received from the corporation, and the corporate returns for the fiscal years ending February 28, 1941 and February 28, 1942, which were executed by Cogan as president (Cogan became president February 29, 1940, upon the retirement of Manheimer), did not reflect the reacquired stock as an asset or liability of the corporation. The corporate returns for those years reflected the common stock on its balance as reduced by the par value of the stock acquired from petitioners in 1940 and 1941.

The corporate directors at a meeting on August 21, 1942, noted that the 657.7 shares of common stock in the corporate treasury had never been cancelled, and that the stated capital was in reality $64,400. A resolution was passed on that day formally reducing the stated capital to that amount

in order to reconcile the corporate records and to reflect the true situation. A similar resolution was adopted by the stockholders of the corporation on August 22, 1942. The corporation during the period from 1934 through 1939 paid dividends of almost $60,000. Its earnings during those years were not substantially different from its earnings during the years with which we are here concerned, the years from 1940 through 1942. During these latter years no dividends were paid.

The Tax Court made detailed findings as to the cumulated earnings and profits of the corporation subsequent to March 1, 1913, and up to the close of the fiscal years ending February 29, 1940, February 28, 1941 and February 28, 1942, as well as the earnings and profits of the corporation for each of the latter fiscal years. We think there is no occasion to set forth such findings inasmuch as no question is raised here but that the earnings and profits of the corporation were ample to bring the distributions in controversy within Sec. 115 (g), provided the other requirements of that section are met.

Upon these facts, the Tax Court found, as the Commissioner had determined, that the distributions of $10,567.20 to each taxpayer in 1940, and of $11,810.40 to Cogan and $11,888.10 to Lowenthal in 1941, in redemption and cancellation of the corporation's stock were made at such time and in such manner as to be substantially equivalent to the distribution of taxable dividends and that they were taxable to them as dividends under Sec. 115 (g).

It is well settled that such a finding is one of fact which we must accept if substantially supported. Commissioner v. Babson, 7 Cir., 70 F.2d 304, 306; McGuire v. Commissioner, 7 Cir., 84 F.2d 431, 433, certiorari denied 299 U.S. 591, 7 S.Ct. 118, 81 L.Ed. 435; Hirsch v. Commissioner, 9 Cir., 124 F.2d 24, 28; Fox v. Harrison, 7 Cir., 145 F.2d 521, 522; Kirschenbaum v. Commissioner, 2 Cir., 155 F.2d 23, certiorari denied 329 U.S. 726, 67 S.Ct. 75, 91 L.Ed. 628.

Furthermore, in view of the decision of the Supreme Court in Kelley v. Commissioner, 326 U.S. 521, 66 S.Ct. 299, 90 L. Ed. 278, the statutory right of review has been circumscribed so as to make it of doubtful, if any, practical value. There, the court had before it two cases where the Tax Court had reached opposite results upon evidentiary facts almost identical. Notwithstanding these contrary results, the Supreme Court sustained its decision in each case. The rationale of the opinion is summarized in headnote (1), which states:

"Two tax cases turned upon the question whether payments made under certain corporate obligations were interest or dividends. Although the facts were quite similar, the characteristics of the obligations in question and the surrounding circumstances were of such a nature that it was reasonably possible to reach the conclusion that the payments were interest to creditors in one case and dividends to stockholders in the other case; and the Tax Court so decided. Held the conclusions of the Tax Court in such cases should be accepted."

We think this opinion unmistakably means that a reviewing court, particularly in a situation such as is here involved, must not disturb a finding by the Tax Court even though an opposite finding by such court might have been equally plausible. As was pointed out in the dissenting opinion, 326 U.S. page 533, 66 S.Ct. 305, 90 L.Ed. 278:

"Hence, it seems to follow, the conclusion may be drawn in squarely conflicting ways, if the Tax Court sees fit so to draw it; and it is immaterial that no factor of substantial difference is or can be pointed out."

We think no good purpose could be served in discussing the various factors relied upon by the Tax Court in support of its finding. It is sufficient to state that a study of the opinion of that court furnishes no basis for holding that its finding is not reasonably supported. Moreover, petitioners do not seriously take issue with the finding based upon the evidentiary facts heretofore related but contend that such facts embody merely the form of the transaction without taking into consideration its substance and effect. For instance, in petitioner's brief it is stated:

"Admittedly the form of the transaction was that of purchase by petitioners from Manheimer and the Trustees and subsequent sale by petitioners to the company.

But is is now too well established to admit of dispute that in cases involving Federal taxes the mere form of the transaction is not determinative but that it is the real effect of the transaction which controls."

Petitioners' insistence that the substance of the transaction was something different from·its form must rest upon the theory that all which took place constituted a single integrated transaction. This includes the sale by Manheimer and the trustees to the corporation of a part of their shares, the sale of the remainder of their shares to petitioners and Shapiro, and subsequently the sale by the latter to the corporation. If there be any basis for this theory, it must be on the premise that petitioners and Shapiro were acting not as principals but for and on behalf of the corporation, and that in reality the stock was acquired by it from Manheimer and the trustees rather than from petitioners and Shapiro.

This brings us to petitioners' contention that the Tax Court erred in striking evidence which shows the substance of the transaction to be something different than its form indicates. We find it difficult to grasp petitioners' theory in this respect. What the Tax Court actually did was to strike "so much of petitioners' evidence as tends to show that they were acting other than as principals." In petitioners' brief it is stated, "It has already been shown that there was no evidence offered to show that petitioners were acting other than as principals, but only to show what the understanding and arrangement was between the parties." It would thus seem there was no evidence on which the ruling of the Tax Court could operate.

At another place in petitioners' brief, referring to the stricken testimony, it is stated, "The court erroneously assumed that it was offered to establish a principal and agency relationship." It was also stated in oral argument before this court that it was not claimed that petitioners were acting as agents of the corporation in the transactions involved. While it is not easy to discern just what evidence the Tax Court intended by its rule to strike, it would seem in view of the turn which the case takes here that there could have been no harm to petitioners. The action of the Tax Court appears to rest on the premise that the taxpayers in their petitions for redetermination of the deficiencies assessed against them made no allegation that they were acting other than as principals or that the substance of the transaction was any different than its form. A reading of the petitions supports the premise, and it is reasonable to think that the person who drafted the petitions had no thought of the theory which petitioners now seek to maintain.

It is asserted in petitioners' brief that the transaction was carried out "in accordance with an arrangement made and acted on by all the parties that the stock owned by Manheimer and the Trustees was to be acquired by the corporation as and when it should be financially able to do so, and that to the extent it could not do so temporarily, petitioners would buy and hold such stock until the corporation could acquire it." There is oral testimony which supports this assertion; however, the question immediately arises as to whom this arrangement was with or between. We find no testimony that such an arrangement was between the petitioners and the corporation. The written contract of February 6, 1940 was between two groups of stockholders, Manheimer and the trustees on the one hand and petitioners and Shapiro on the other, and this contract taken in connection with the oral testimony demonstrates that any understanding or arrangement that might have been in the minds of the parties (although not expressed in their written instrument) was not binding in any way upon the corporation.

In fact, the written contract dispels any notion that Manheimer and the trustees relied upon the corporation to assure performance by petitioners and Shapiro. Adequate provisions were made in the contract for their security. For instance, it was provided that the shares sold to petitioners and Shapiro should remain in the possession of Manheimer and the trustees as collateral security, and Manheimer and the trustees upon the failure of performance by petitioners and Shapiro were given authority to sell such shares pledged as collateral without demand of payment or notice. The contract was made "binding upon the heirs, administrators and assigns of the parties hereto."

Furthermore, another contract of February 6, 1940, between Cogan and Lowenthal on the one hand and Shapiro on the other, appears to contradict any claim that petitioners had an agreement or arrangement by which the stock was being purchased for or on behalf of the corporation. The agreement recites that petitioners and Shapiro were desirous of equalizing their ownership and holdings in the corporation and for that purpose it was agreed that Shapiro would sell twenty shares to Cogan and sixty shares to Lowenthal. This was done by a transfer of a part of the shares which Shapiro had acquired from Manheimer and the trustees. This agreement between petitioners and Shapiro further provided for a voting trust and that prior thereto no one or any of the parties "will sell or offer for sale, or assign any portion of the stock owned by them to any one without first offering such stock for sale to the other parties." It was further provided that the parties should have an option to purchase any stock offered for sale in equal amounts between them.

It no doubt is true, as asserted, that the purpose of Manheimer and the trustees was to dispose of all their stock in the corporation and sever their connections with it, and it may be true that petitioners and Shapiro expected to obtain from the corporation the balance of the funds required by them to perform the contract, but, even so, this is a far cry from the assertion that the corporation was a party to any such arrangement or understanding or that petitioners and Shapiro were acting either as its agents or for and on its behalf.

So, in our view, when all the evidence is considered, the so-called substance of the transaction is of no benefit to petitioners; in fact, the substance, insofar as material, is not essentially different from the form.

Petitioners place great reliance upon the decision of this court in Fox v. Harrison, 7 Cir., 145 F.2d 521. This case may at once be distinguished by the fact that the taxpayer had a favorable finding in the District Court, while here the taxpayers are confronted with an unfavorable finding by the Tax Court. It is also distinguishable on the facts, even though the opinion may contain some language favorable to the petitioners here. That case rests on the premise that the taxpayer purchased stock on behalf of the corporation with funds which he borrowed from an outside party and which he repaid with funds later obtained from the corporation upon the transfer of the stock. Under the circumstances, it was thought that the redemption was made by the corporation from the original seller rather than from the taxpayer. As the court stated, 145 F.2d page 522: "In reality, the involved stock was purchased by the corporation from Cross." As already shown, there is here no foundation for the claim that petitioners and Shapiro at the time they purchased the stock from Manheimer and the trustees were acting on behalf of the corporation, or that in reality the stock was purchased by the corporation from Manheimer and the trustees. Such a claim is refuted by the written contracts referred to, as well as by the pleadings, and such refutation is not impaired by the oral testimony, assuming it may properly be considered for such purpose. Neither does the fact that petitioners and Shapiro decided at some subsequent time to transfer the stock to the corporation alter the situation.

The decisions of the Tax Court are affirmed.

KERNER, Circuit Judge, concurring in the result.