Oscar F. ERICKSON and Aminta K.
Erickson, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. P–2261.

United States District Court
S. D. Illinois, N. D.

Dec. 5, 1960.

■■■■■■■■■■■■■■■

---◆---

Robert Morgan, Davis, Morgan & Witherell, Peoria, Ill., for plaintiff.

Harlington Wood, Jr., U. S. Atty., Springfield, Ill., William F. Kolbe, Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

MERCER, Chief Judge.

On August 12, 1960, a memorandum order was filed in this cause for judgment in favor of defendant dismissing the complaint.

Plaintiff's motion for additional findings of fact and for amendment of findings of fact and conclusions of law was seasonably filed. Briefs were filed by the parties and oral argument thereon was heard, and the cause is now before the court upon that motion.

The issue presented upon taxpayer's motion for additional findings of fact and to amend the special findings of the original memorandum is, basically, one of the materiality of the findings proposed to the legal issue presented upon the trial. That issue further resolves itself into a question of the value as a precedent of Fox v. Harrison, 7 Cir., 145 F.2d 521, in the light of the opinion and decision in Lowenthal v. Commissioner, 7 Cir., 169 F.2d 694. Speaking generally, the proposed additional findings, are supported by the evidence before the court, and are closely analogous to the evidentiary proof as summarized by Judge Major in the Fox opinion. However, if the effect of the Lowenthal opinion and decision is to detract from the authority of Fox to the extent that the legal import of transactions which are formalized in writing may not be contradicted by evidence of unformalized intentions which would vary the legal effect of the formalized writings, then such proposed additional findings become immaterial to the legal issue before the court. I so construed the Lowenthal case in entering the original findings and conclusions and concomitant judgment.

Upon rereading and comparing Fox and Lowenthal, I am now convinced that my original appraisal of the comparative relationship between the two opinions was erroneous. In Lowenthal, the claim that the petitioners had acted for the corporation in the acquisition and subsequent retirement of stock which led to a determination of income tax liability was refuted, not only by the formalized written instruments attending the purchase of the shares and the allocation thereof among petitioners, but also by the theory stated in the pleadings upon which the case was submitted to the Tax Court for decision. When that facet of Lowenthal is appreciated, it is seen that the factual distinction from Fox stated by Judge Major, 169 F.2d at page 700, rests upon a real basis and is not as illusory as it appears at first glance.

In Lowenthal, the pleadings and the evidence disclosed a transaction among individuals without any corporate participation, tempered, if at all, by an intention of the individuals to withdraw moneys from the corporation to enable them to complete their stock purchase agreement. By contrast, the evidence adduced in Fox led to the conclusion that the purchase of stock by Fox and the subsequent sale of that stock to the corporation were parts of a total transaction made necessary by the fact that the corporation, initially, lacked the funds or credit necessary to purchase the shares in the first instance. The decision was that Fox had acquired the stock on behalf of the corporation as a temporary expedient which culminated in the acquisition from Fox of those shares by the corporation when its financial position improved.

If my construction of those two cases be correct, as I am now convinced, material findings of fact were omitted from my original disposition of the case and certain findings were made which lack materiality in the light of such construction. Accordingly, the original findings of fact are stricken and findings of fact as follows are substituted therefor.

1. The court has jurisdiction of the parties and the subject matter in litigation.

2. Upon the death of Richard Belsterling, the majority stockholder of Fred Harbers' Sons, Inc., the executors of his estate desired to liquidate his 491 shares of the capital stock of that corporation. The remaining individual shareholders were agreed that that result should be accomplished as expeditiously as possible and that the shares should be purchased from the estate at their agreed book value of $189.57 per share.

3. Of the remaining individual shareholders, only the taxpayer was actively engaged in the conduct of the corporation's bread and butter business. Gordon Belsterling and William Harbers had retired from active participation in the conduct of the corporate business, and each desired that taxpayer assume majority ownership, with its concomitant responsibilities and risks.

4. Shortly after the death of Richard Belsterling, discussions were initiated by the remaining individual shareholders with the corporation counsel and corporation accountant to devise a means for the liquidation of the shares of the Belsterling estate. Taxpayer was willing to purchase the shares, but was limited by his available assets to the purchase of 132 shares only, having a then book value of $25,078.87. Taxpayer was not financially able to purchase the remaining 359 shares which had an aggregate agreed value of $68,000.

5. In and prior to March, 1954, the corporation was engaged in the Y.M.C.A. construction project which required a 10% holdback of progress payments until completion, and which required the corporation to rely upon its credit to obtain operating funds for completion of that contract. In March, 1954, the Y.M.C.A. construction project was approximately 40% completed.

6. In March, 1954, the corporation lacked liquid assets sufficient to retire the remaining $68,000 of the shares of the Belsterling estate. The shareholders were advised by the corporation accountant and corporation counsel that borrowing money at that time to retire $68,000 value of its shares would impair the corporation's financial condition and credit to such extent that its ability to complete its construction contracts, and the Y.M.C.A. contract in particular, might be jeopardized. Of the individual shareholders, only William Harbers had $68,000 available which might be used for purchase of the remaining 359 shares from the estate. He was willing to supply the money on a temporary basis, but was not interested in a long term investment in the shares. The shareholders were advised that a loan of the money to the corporation by Mr. Harbers for retirement of the shares at that time would adversely affect the corporation's financial condition and credit. They were also advised that the purchase of the shares by Mr. Harbers with a contemporaneous commitment by the corporation to purchase or retire the shares at a future date would have an immediate and like effect upon the corporation's credit.

7. Faced with the alternatives of the situation, the individual shareholders agreed that the $68,000 would be supplied by Mr. Harbers, secured by taxpayer's individual promissory note and placement of the shares acquired from the estate in escrow, with the understanding that the $68,000 would be paid from corporation funds and that the 359 shares would be retired by the corporation when the corporation was financially able so to do. Pursuant to that agreement and understanding, the 359 shares were purchased from the estate with funds supplied by Mr. Harbers. Contemporaneously therewith, taxpayer delivered his personal note to Mr. Harbers in the amount of $68,000. A new certificate for 491 shares was issued in taxpayer's name, which was immediately endorsed in blank by him and delivered to an escrow agent as security for the note.

8. By July, 1955, the Y.M.C.A. contract was essentially completed and the corporation was able to relieve itself from its credit commitments on that project and to forsee that its financial and

credit condition would permit the retirement of the 359 shares at that time. Acting upon the exigencies of that changed situation, the contemplated retirement of the 359 shares was approved on the corporation records and the shares were retired on July 21, 1955.

9. The purchase of the 359 shares from the Belsterling estate, with the contemporaneous loan arrangement between taxpayer and Mr. Harbers, and the sequence of events of July 21, 1955, by which the stock was retired and taxpayer's note was cancelled, are shown by the undisputed testimony to be part and parcel of the plan and understanding of all shareholders of the corporation devised and reached upon advice of corporation counsel in March, 1954.

10. Taxpayer derived no benefit from the retirement of the shares by the corporation. He had obtained majority control of the corporation with his purchase of 132 shares from the Belsterling estate. Although he was willing to purchase the balance of the Belsterling shares in 1954, he was then unwilling to do so at the expense of jeopardizing his own financial condition. The plan formulated was a compromise which led taxpayer to pledge his credit to secure the loan from Mr. Harbers, which, in turn, permitted the immediate liquidation of the Belsterling shares by the estate.

11. When the evidence is considered in its proper perspective within the teachings of the reported cases, taxpayer, in acquiring and holding the 359 Belsterling shares, acted in accordance with a formulated plan as an expedient depository which enabled the Belsterling estate to liquidate its holdings without awaiting events which, ultimately, would enable the corporation to retire those shares. His act was not directed by an individual purpose of financial gain, but, only, by a desire to further the purpose of all shareholders, and of the corporation because of the concurrent uniform desire of all shareholders, to aid immediate liquidation of the Belsterling estate shares without thereby jeopardizing the financial standing and productive ability of the corporation.

12. The payment of $68,000 to Mr. Harbers by the corporation for the 359 Belsterling shares and the contemporaneous cancellation of taxpayer's note to Mr. Harbers was not a distribution to taxpayer which was essentially equivalent to a dividend within the meaning of the statute.

13. From March, 1945, until July 21, 1955, taxpayer possessed the indicia of individual ownership of the 359 shares inasmuch as he retained the right to vote those shares at meetings of shareholders and to receive dividends thereon, if any. No dividends were declared by the directors at any material time. An inference of individual ownership and benefit to taxpayer arises out of the fact that he paid interest upon the Harbers' note in that interim period. These inferences of individual purpose are far outweighed by the uncontradicted testimony that his ostensible ownership of the 359 shares was only an element of a plan of expediency which was ultimately directed to the retirement of those shares by the corporation.

14. Taxpayer has sustained his burden of proving the material allegations of the complaint.

Upon the facts as above found, the original conclusions of law are stricken and the following conclusions of law are substituted therefor:

1. The fact of the discharge of the Harbors note upon the corporation's retirement of the 359 shares derived from the Belsterling estate does not, of itself, lead to the conclusion that taxpayer has received a distribution from the corporation which is essentialy equivalent to a dividend. It is not necessary that a corporate purpose for retirement of the shares, as distinguished from a purpose of all of its shareholders, be shown, for the reason that it is the effect of the retirement of the shares, not the purpose which actuated that event, which controls the determination of dividend equivalence. Holsey v. Commissioner, 3 Cir.,

258 F.2d 865, 869; see Fox v. Harrison, 7 Cir., 145 F.2d 521, 522.

2. The tax consequences of a transaction depend upon the substance of the transaction, and are not to be determined solely from the legal form employed to transfer title. The substance of a transaction must be determined by viewing each step of the transaction in its relationship to the whole. Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981. In determining the tax consequences of this transaction which culminated in the retirement of the 359 shares of stock, the legal effect of written instruments evidencing a part of the total transaction are not controlling. Ibid. The court must look through the form as represented by such instruments to the substance of the total transaction as evinced by the uncontradicted evidence as a whole. Fox v. Harrison, 7 Cir., 145 F.2d 521, 522.

3. Under the circumstances as disclosed by the uncontradicted evidence, the payment by the corporation of $68,000 to Mr. Harbers for retirement of the 359 shares, which resulted in the cancellation of taxpayer's note to Harbers, is not a distribution by the corporation for taxpayer's benefit which was essentially equivalent to a dividend under the provisions of Section 301(c) of the Code, with reference to Section 316 of the Code, 26 U.S.C.A. §§ 301(c), 316. Taxpayer acquired the shares, pursuant to the agreement of all shareholders, as a temporary expedient and held the shares until the corporation was able to retire them without thereby jeopardizing its financial, credit and operational stability. "In reality," the involved shares were purchased by the corporation from the Belsterling estate, with taxpayer acting as a temporary repository therefor until the total transaction could be consummated by the corporation's retirement of the shares. See Fox v. Harrison, supra.

4. The Commissioner erred in his determination that taxpayer had derived taxable income from that transaction within the meaning of Section 301(c), with reference to Section 316.

5. Taxpayer has proved his complaint by the stipulation of facts and the uncontradicted evidence. The judgment order of the original memorandum should be stricken, and judgment should be entered for taxpayer against defendant.

The judgment order of the August 12th memorandum is, accordingly, stricken, and judgment is entered in favor of taxpayer against defendant for the sum of $28,503.84, together with statutory interest, as prayed in the complaint. The August 12th memorandum, as herein modified, is reaffirmed.