FRANK CIAIO AND MARY CIAIO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 312–65. Filed January 31, 1967.

*Merle A. Wolfson*, for the petitioners.
*Edward L. Newberger*, for the respondent.

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax for the calendar years 1959, 1960, and 1961 in the amounts of $73,726.57, $3,028.50, and $1,174.05, respectively. The deficiencies for 1960 and 1961 are not in controversy and not all of the adjustments made for the year 1959 are in controversy. The only errors assigned by petitioners are as follows:

(a) The Commissioner erroneously determined that petitioner, Frank Ciaio, received a distribution of $150,000.00 from Melody Shoe Corporation during the calendar year 1959.

(b) The Commissioner erroneously determined that the $150,000.00 allegedly received by the petitioner from Melody Shoe Corporation during 1959 was taxable pursuant to sections 61, 301 and 316 and subchapter "P" of the Internal Revenue Code of 1954 as follows:

| | |
|---|---|
| Taxable as ordinary dividend | $121, 951. 96 |
| Applicable against basis of stock | 13, 333. 33 |
| Taxable as long-term capital gain | 14, 714. 71 |
| Total distribution | 150, 000. 00 |

#### FINDINGS OF FACT

Some of the facts were stipulated and are incorporated herein by reference.

Petitioners [1] are husband and wife and reside at 43 N. Thomas Avenue, Kingston, Pa. They filed a joint individual income tax return for the calendar year 1959, on the cash basis, with the district director of internal revenue at Scranton, Pa.

In 1948 George Frier, Irving Schor, and petitioner caused a corporation to be organized under the laws of the State of New York, known as Melody Shoe Corp.,[2] hereinafter sometimes referred to as the corporation. The corporation was formed for the purpose of manufacturing and selling footwear and after its formation engaged in such business.

The authorized capital stock of the corporation consisted of 100 shares of no-par-value common stock designated class A stock, and 100 shares of no-par-value common stock designated class B stock. All voting power was vested in the holders of class A stock. In all other respects the two classes of stock had similar rights and privileges.

At the time of the formation of the corporation the shareholders and the corporation entered into an agreement dated July 23, 1948, restricting the transfer of the stock and granting to the other shareholders an option to purchase any shares of stock which a shareholder desired to offer for sale. In the event that the shareholder did not exercise the option, the corporation was given the right to do so.

---

[1] Mary Ciaio is a petitioner herein only by reason of the filing of joint returns with her husband. Unless otherwise indicated, Frank Ciaio will hereinafter be referred to as the petitioner.

[2] Also referred to in the record as Melody Shoe Co., and Melody Shoe Corp.

Prior to September 28, 1959, the stock of the corporation was equally owned by the three shareholders, namely, petitioner, Frier, and Schor. The number of shares owned and the basis thereof to the shareholders were as follows:

| Shareholders | Shares of stock | | Basis |
| --- | --- | --- | --- |
| | Class A | Class B | |
| Frier | 20 | 20 | $13,333.33 |
| Schor | 20 | 20 | 13,333.33 |
| Petitioner | 20 | 20 | 13,333.33 |
| Total | 60 | 60 | 40,000.00 |

Prior to the formation of the corporation, the shareholders had been employed variously in the footwear industry: Frier in sales; Schor as a patternmaker; and petitioner as a factory superintendent for I. Miller shoes. Frier was to handle sales promotion, Schor was to supervise production, and petitioner was to conduct the general management of the corporation. For some time this arrangement worked satisfactorily, as a result of which the corporation enjoyed modest success. The corporation had approximately 300 people working, had a million dollar payroll, and had approximately 100 good customers.

About 1959, disputes arose among the shareholders of the corporation. They could not agree on what type of shoes to produce. Their arguments and discord were hurting the business. Manufacturing operations were suspended for 4 months. If this situation had been allowed to persist for another few months, the entire business would have been lost.

As a result of such disagreements, various meetings were held by the shareholders. Schor indicated he wanted to sell his interest in the corporation. He engaged Joseph Carr, a certified public accountant, to represent him. Later, Frier voiced an opinion that he, too, wanted to get out. Several attempts were made, particularly between Carr and Frier, who also had an accounting background, at evaluating the corporation's stock. Eventually, it was agreed that Schor and Frier would sell all of their stock to the corporation for $150,000, each of the sellers receiving $75,000 in cash.

Max Rosenn was retained as counsel for the corporation. The corporation was also represented by Andrew Kovalchik, a certified public accountant. Rosenn drew up an "Agreement" dated September 28, 1959 "by and between" Frier and Schor "both of whom are to be referred to hereinafter, collectively, as the 'Sellers'; and Melody Shoe Co. * * * hereinafter referred to as the 'Buyer.'" Among other things, the said agreement dated September 28, 1959, provided that:

WHEREAS, the parties have reached an understanding with respect to the

sale by the SELLERS and the purchase by the BUYER of two-thirds of all of the issued and outstanding capital stock of MELODY SHOE CO. * * * Now, THEREFORE, this Agreement witnesseth: 1. The SELLERS do hereby agree to bargain and sell to the BUYER their respective interests in the Corporation * * * and—

10. The BUYER agrees to purchase the SELLERS' respective interests in the Corporation upon the following terms and conditions:

The total purchase price for all the SELLERS' interests in said Corporation is One Hundred Fifty Thousand ($150,000.00) Dollars, Seventy-five Thousand ($75,000.00) Dollars of which is to be paid to each of the SELLERS upon the execution of this Agreement.

The said agreement dated September 28, 1959, was signed, sealed, witnessed, and attested to as follows:

(S)    George Frier       [SEAL]
       GEORGE FRIER
(S)    Irving Schor       [SEAL]
       IRVING SCHOR, SELLERS
       MELODY SHOE CO.
By: (S)    FRANK CIAIO       [SEAL]
       *President*

Witness:
(S)   JOSEPH CARR
Attest:
(S)   IRVING SCHOR
     *Secretary*
[CORPORATE SEAL]

Attached to the said agreement dated September 28, 1959, was a "Waiver" dated September 28, 1959, specifically waiving any and all restrictions set forth in the previously mentioned agreement dated July 23, 1948, pertaining to the transfer and sale of the capital stock of the corporation. The waiver was signed and sealed by all the shareholders of the corporation, and also in the name of the corporation by petitioner as president. It was attested to by Schor as the secretary of the corporation and bore the corporation's seal, as did the agreement of September 28, 1959.

On September 28, 1959, both Frier and Schor signed a "Release" in which they released, etc., and forever discharged the corporation and petitioner from all debts, demands, actions, etc.—

which may have resulted from the relationship between FRANK CIAIO, GEORGE FRIER, and IRVING SCHOR as stockholders, officers and directors of the Melody Shoe Co., from the beginning of the world to the date of these presents and which have not specifically been excepted or reserved in an Agreement of Sale entered into this day between GEORGE FRIER and IRVING SCHOR and the MELODY SHOE CO.

On August 26, 1959, a letter addressed to petitioner at his home address and signed by both Frier and Schor stated:

DEAR MR. CIAIO:

This letter will confirm our understanding that we will sell and deliver unto you all of our capital stock in Melody Shoe Corporation, consisting of two-thirds of the outstanding issued stock, the other one-third being presently held by you. Delivery of the stock will be made in accordance with the terms of the agreement entered into between us and upon payment of the total purchase price of $75,000.00 to each of us, or an aggregate sum of $150,000.00.

Very truly yours,

This letter was not drafted by either Frier or Schor or by the petitioner. It was drafted by the bank (hereinafter mentioned) for its own purposes. It did not reflect the understanding of the three shareholders. Although the letter states that delivery of the stock will be made "in accordance with the terms of the agreement entered into between us," no agreement had at that time been entered into. The formal written agreement of September 28, 1959, was not in accord with the so-called understanding stated in the letter.

Also, prior to September 28, 1959, namely, on August 31, 1959, application was made by the corporation through petitioner as president of the corporation, to the Wilkes-Barre, Pa., office of the Northeastern Pennsylvania National Bank & Trust Co., hereinafter sometimes referred to as the bank, for a loan of $150,000 to be made to the corporation.

On September 25, 1959, the corporation was advised by Kenneth Burdon, vice president of the bank, that the loan application had been approved. The notification was addressed to petitioner and is as follows:

WILKES-BARRE, PENNSYLVANIA

NORTHEASTERN PENNSYLVANIA NATIONAL BANK AND TRUST COMPANY

SEPTEMBER 25, 1959.

Mr. FRANK CIAIO
*43 North Thomas Avenue*
*Kingston, Pennsylvania*

DEAR FRANK:

Please be advised that we have approved a $150,000 term loan to the Melody Shoe Corporation to be amortized monthly over a five year period beginning January 1, 1960, with interest at 6% per annum, on the following basis.

1. Assignment of $100,000 John Hancock Mutual Life Insurance Company, Policy No. 6413312.

2. Pledge of all stock of Melody Shoe Corporation.

3. Security Agreement covering machinery and fixtures.

4. Personal guaranty of Frank Ciaio and Mary Ciaio, his wife.

Term loan to include, among others, the following restrictions or negative clauses:

(1) Limit salaries of officers—Frank Ciaio's to $15,000 per year

(2) No dividends to be paid during life of loan

(3) Limit of purchase of any Fixed Asset in excess of $5,000 without our consent

(4) Management Clause (Right to remove management if not satisfactory to bank)

(5) After acquired property to come under our loan

(6) No loans or advances to officers or corporations without our consent

(7) No other borrowing without our consent

It will be necessary for you to have a Stockholders meeting to approve the foregoing and pass the necessary resolutions in connection with this transaction. Please consult your attorney as you will possibly need a Directors meeting also.

We expect the term loan agreement to be typed before Noon on Monday.

Very truly yours,

(s)   Kenneth A. Burdon
KENNETH A. BURDON
*Vice President*

KAB/ech

cc: Attorney Max Rosenn
    Attorney Robert J. Doran

As a result of the above letter, dated September 25, 1959, a special meeting of the board of directors of the corporation was held at the office of Rosenn, Jenkins & Greenwald, attorneys, in Wilkes-Barre, Pa., on September 28, 1959, for the purpose of approving all of the terms of the proposed loan stated in the bank's letter dated September 25, 1959, and other related business. The last paragraph of page 1 of the minutes of this meeting recited the following:

The President then stated that he had negotiated a loan with the Northeastern National Bank and Trust Co. for $150,000.00, the proceeds of which will enable the corporation to purchase all of the capital stock of George Frier and Irving Schor in Melody Shoe Corp.

The above minutes of the September 28, 1959, board meeting also provided:

The President then produced a proposed agreement relating to the sale of capital stock by Irving Schor and George Frier to Melody Shoe Co. which agreement had attached thereto a waiver by this corporation of the restrictive provisions pertaining to the sale and transfer of the capital stock of the corporation contained in a certain shareholders' agreement of July 23, 1948 and any amendments thereto. Upon motion made, seconded and carried, the President and Secretary of the Corporation were authorized to execute the waiver in behalf of the corporation.

The above-mentioned minutes were drafted by Rosenn and signed by Schor as secretary of the corporation.

On or about October 1, 1959, a meeting was held at the office of the bank for the purpose of closing the $150,000 loan to the corporation. This meeting was attended by the petitioner, Frier, Schor, Rosenn, Kovalchik, Carr, petitioner Mary Ciaio, Frieda Schor (a director of the corporation until Sept. 28, 1959, when she tendered her resignation), Burdon, Stanley J. Brockman (a new director of the corporation elected on Sept. 28, 1959), and Robert J. Doran (now deceased) who was counsel for the bank.

At this October 1, 1959, meeting at the bank, Doran reviewed the previously executed agreement dated September 28, 1959, between Frier and Schor, as sellers, and the corporation as the buyer, and stated that it did not conform with the terms of a "Loan Agreement" dated October 1, 1959, which he (Doran) had prepared. The 13-page executed loan agreement was by and between the corporation as first party, the bank as second party, and the petitioners as third-party guarantors. Among other things, the said loan agreement provided:

The Corporation wishes to borrow from the Bank the sum of One Hundred Fifty Thousand ($150,000.00) Dollars, and the Bank is willing to lend to the Corporation such sum on the terms and conditions hereinafter stated. The undersigned parties hereto accordingly agree as follows:

SECTION 1. AMOUNT AND TERMS OF LOAN

(a) The Bank agrees to lend on October 1, 1959 to the Corporation, the sum of $150,000.00. Such loan shall be evidenced by a promissory note (hereinafter called the Note) in such amount to be payable with interest only monthly to and including January 1, 1960; then in sixty (60) consecutive monthly installments of $2,500.00 each; * * *

(b) Such note shall be executed by the borrower and also by the Guarantors, Frank Ciaio and Mary T. Ciaio, his wife, jointly and severally, and shall be substantially in the form annexed hereto; the Guarantors of such note shall be jointly and severally liable thereon.

\*     \*     \*     \*     \*     \*     \*

SECTION 3. NEGATIVE COVENANTS

\*     \*     \*     \*     \*     \*     \*

B. The Corporation also covenants and agrees that, until payment in full of the principal of, and interest on, the Note made hereunder, without the permission in writing of the Bank.

(1) It will not permit or allow to be made any withdrawal by, or distributions, payments, or dividends to, any shareholders, officers or employees of the Corporation.

\*     \*     \*     \*     \*     \*     \*

SECTION 6. MISCELLANEOUS

\*     \*     \*     \*     \*     \*     \*

(i) The proceeds of the loan made hereunder are to be used for the purchase and payment in full of all stock of Melody Shoe Corporation now registered on the books of Melody Shoe Corporation as follows:

| Registered in name of | Shares— class A | Shares— class B |
|---|---|---|
| Irving Schor | 20 | 20 |
| George Frier | 20 | 20 |

This stock will then be re-issued in the name of Frank Ciaio, and then together with the stock of Melody Shoe Corporation now registered on the books of Melody Shoe Corporation as follows:

| Registered in name of | Shares— class A | Shares— class B |
|---|---|---|
| Frank Ciaio | 20 | 20 . |

which will constitute a total of stock of Melody Shoe Corporation then registered on the books of Melody Shoe Corporation and issued as follows:

| Registered in name of | Shares— class A | Shares— class B |
|---|---|---|
| Frank Ciaio | 60 | 60 |

which is the entire stock of Melody Shoe Corporation to be issued during the term of this loan will be assigned by Frank Ciaio and deposited with the Bank as collateral security for this loan.

\* \* \* \* \* \* \*

IN WITNESS THEREOF AND INTENDING TO BE LEGALLY BOUND HEREBY, the Melody Shoe Corporation and the Northeastern Pennsylvania National Bank and Trust Company have caused this Agreement to be duly executed by their authorized officers and fixed the respective corporate seals hereto and Frank Ciaio and Mary T. Ciaio, his wife, Guarantors, have caused their hands and seals to be affixed hereto the day and year first above written.

> MELODY SHOE CORPORATION
> By (S)  FRANK CIAIO
> *President*
> NORTHEASTERN PENNSYLVANIA
>   NATIONAL BANK AND TRUST COMPANY
> By (S)  KENNETH A. BURDON
> *Vice President*
> FRANK CIAIO, GUARANTOR
> (S)  Frank Ciaio
> MARY T. CIAIO, GUARANTOR
> (S)  Mary T. Ciaio

Attest:
(S)  MARY T. CIAIO
     *Secretary*
Attest:
(S)  N. R. FOSS
     *Ass't Sec'y*
Witness:
(S)  ELAINE C. HENDRICKS
Witness:
(S)  F. J. ECK

Doran advised Rosenn and petitioner that he would not permit the bank to make the loan to the corporation if the transaction remained in its then existing form.

Doran's position was that the bank would be criticized by the bank examiners in view of the fact that the proposed transaction would deplete the assets of the corporation.

The balance sheet of the corporation, as of August 31, 1959, indicated that the stockholders' equity as of that date was $151,348.44.

After being advised by Rosenn that, as stated by Doran, the only way the corporation could obtain the loan applied for was for petitioner to agree to have the purchase agreement changed so as to show petitioner as "Buyer" rather than the corporation, petitioner agreed to substitute his name as buyer for that of the corporation on the stock purchase agreement that had been signed on September 28, 1959. Peti-

tioner agreed to do this solely because of his concern for the business of the corporation. He wanted to get the business going again as it had been shut down for 4 months.

Rosenn thereupon altered the stock purchase agreement of September 28, 1959, by striking out the name of the corporation as "Buyer" and superimposing thereon in his own handwriting the words "Frank Ciaio." On the signature page, he struck out the words "Melody Shoe Co.," "By," and "President" which appeared beneath the signature of the petitioner. Petitioner's name, which he had originally signed in his capacity as president of the corporation, was left unaltered. On this page, Rosenn also struck a line through the name of "Irving Schor" in the place where Schor had signed as corporate secretary. Frier, Schor, and petitioner did not again sign the agreement but, rather they initialed each page of the agreement. Carr, who witnessed the original signing of the agreement, did not again affix his signature as a witness.

No change was made to the signatures and attestation on the waiver. The body of the waiver was, however, changed, and the change initialed, by superimposing the name "Frank Ciaio" above the stricken words "the Melody Shoe Co." in that part of the waiver which read "and agree to and approve of the sale and transfer of the stock set forth in the foregoing agreement by George Frier and Irving Schor to the Melody Shoe Co."

No change was made in the above-mentioned release signed on September 28, 1959.

Page 1 of the minutes of the board meeting held on September 28, 1959, was retyped so as to add the seven words "and sell the same to Frank Ciaio" after the name "Melody Shoe Corp." appearing in the last paragraph as previously set forth herein. The changed minutes were initialed by Frier, Schor , and petitioner.

On or about October 1, 1959, the loan was made to the corporation by the bank by the issuance to the corporation of a cashier's check payable to "Melody Shoe Corporation and Frank Ciaio and Mary T. Ciaio" in the amount of $150,000. The check was endorsed by the payees and deposited in the account of the corporation maintained at the bank.

A check drawn on the account of the corporation in the amount of $75,000 was delivered to Frier in payment for 20 shares of class A and 20 shares of class B stock of the corporation.

A check also drawn on the account of the corporation in the amount of $75,000 was delivered to Schor in payment for 20 shares of class A and 20 shares of class B stock of the corporation.

Upon receiving payment for their stock, Frier and Schor endorsed their stock certificates in blank. Later, at some undisclosed time, petitioner's name was inserted in the assignments as the assignee.

In permitting his name to be substituted for the corporation on the stock purchase agreement, petitioner did not consider how the revised transaction might be reflected on the books of the corporation. He was interested mainly in having the corporation resume its operations. He left the accounting of the revised transaction to the corporation's accountant, Kovalchik.

The loan from the bank was recorded on the books of the corporation as a debit (increase) to cash and a credit (increase) to notes payable-bank, both entries being in the amount of $150,000.

The disbursements made by the corporation to Frier and Schor were recorded on the books of the corporation as a credit (decrease) to cash and a debit (increase) to "Accounts Receivable—Frank Ciaio," both entries being in the amount of $150,000.

The decision to reflect the disbursements made by the corporation to Frier and Schor as loans to petitioner was decided upon by Kovalchik.

The "Accounts Receivable—Frank Ciaio" account set up on the books of the corporation was noninterest bearing and no amounts have ever been repaid to the corporation by petitioner.

Petitioner never intended that these disbursements should in fact be a loan from the corporation to him, nor was it intended that he should pay such amounts to the corporation.

The "Accounts Receivable—Frank Ciaio" account was intended to indicate a suspense account to serve until such time as the loan from the bank was paid off and the stock held as collateral released. At such time it was anticipated that the stock would be turned back into treasury stock and the above account eliminated from the books. No further charge or credit was ever made to this account.

Subsequent to October 1, 1959, petitioner individually made loans to the corporation from time to time up to about $100,000, but all of these loans were entered on the books of the corporation in a separate loans payable account.

The corporation repaid the loan to it of $150,000 at the rate of $2,500 a month as called for in the loan agreement dated October 1, 1959.

The earnings and profits of the corporation available for distribution as a dividend in the fiscal year ended August 31, 1960, was $121,951.96.

### ULTIMATE FINDINGS

Petitioner was acting on behalf of the corporation in negotiating and arranging for the purchase of the stock of Frier and Schor.

Frier and Schor sold their stock to the corporation and not to the petitioner.

The corporation was obligated to purchase and did purchase and pay for the stock owned by Frier and Schor. Payments of $75,000 made by the corporation to each Frier and Schor, respectively, were in discharge of its own obligation and not that of the petitioner. The

payments so made by the corporation to Frier and Schor did not constitute loans to the petitioner. Neither did such payments relieve petitioner of any preexisting indebtedness.

OPINION

Respondent determined, under section 301, I.R.C. 1954,[3] that the payments totaling $150,000 made by the corporation to its two withdrawing shareholders (Frier and Schor) were made in discharge of an obligation of petitioner to purchase their shares and therefore constituted a constructive "distribution" taxable as a constructive "dividend" to the extent of the accumulated earnings and profits of $121,951.96 and taxable as a constructive "capital gain" to the extent that the balance of the constructive distribution exceeded the basis of petitioner's stock in the corporation. See also secs. 61, 316, and subch. P, I.R.C. 1954.

Petitioner contends that the said payments made by the corporation were made in the discharge of the corporation's own obligation to purchase the stock of Frier and Schor and that, in substance, all undertakings and agreements by petitioner in connection with the transaction were done and made by him as agent or as a conduit for the corporation, for its benefit and convenience.

The question, therefore, in substance is, whose "obligation" was the corporation discharging when it made the payments of $75,000 to each of the two withdrawing shareholders? Or, stated in another way, was petitioner in substance obligated to buy the stock of Frier and Schor or was the corporation so obligated? Substance must prevail over form. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." *Helvering* v. *F. & R. Lazarus & Co.*, 308 U.S. 252. The taxpayer as well as the Government is entitled to the benefit of the rule that the substance rather than the form of a transaction controls. *Landa* v. *Commissioner*, 206 F. 2d 431, 432 (C.A.D.C. 1953).

In resolving the question, we must give careful consideration to all of the evidence and circumstances and not to isolated parts thereof.

[3] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

\*   \*   \*   \*   \*   \*   \*

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

(2) AMOUNT APPLIED AGAINST BASIS.—That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock.

(3) AMOUNT IN EXCESS OF BASIS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property.

By written agreement dated September 28, 1959, the two withdrawing shareholders, Frier and Schor, as sellers, agreed to sell all their stock in the corporation to the corporation, as buyer. The bank agreed to and did lend the corporation $150,000 so the corporation could carry out its agreement to purchase the stock of the two withdrawing shareholders. The bank, in so doing, required petitioner and his wife to sign as guarantors, and required all the stock temporarily to be placed in petitioner's name and deposited with the bank as collateral security for the loan to the corporation. It also insisted on striking out the corporation's name as buyer, on the purchase agreement of September 28, 1959, and inserting in its place petitioner's name as buyer. We do not regard this as in any way changing the substance of the transaction agreed to by the corporation and the two withdrawing shareholders. When the corporation paid the two withdrawing shareholders $75,000 each for their stock, it was paying its own obligation and not any obligation of the petitioner. The corporation faithfully paid off the loan to the bank at the rate of $2,500 a month as agreed to in the October 1, 1959, loan agreement.

The real substance of the transaction is, in our opinion, perfectly clear. The transaction was simply and purely a purchase by the corporation of the stock of Frier and Schor, using the petitioner as its instrument. Frier and Schor got the cash. Petitioner received nothing from the transaction except a proportionate increase in the reduced assets of the corporation. He started out, in effect, with 33⅓ percent of 100 percent and ended up with 100 percent of 33⅓ percent.

The facts in this case resemble the facts in *Fox* v. *Harrison*, 145 F. 2d 521 (C.A. 7, 1944). In that case the Seventh Circuit, in affirming the District Court for the Northern District of Illinois, Eastern Division,[4] said:

We are of the view that the situation thus related amply supports the findings of the trial court. * * * Appellant's theory is apparently predicated upon the mere form of the transaction, without giving consideration to the substance. In reality, the involved stock was purchased by the corporation from Cross. That the purchase was not made directly from him was due to the inability of the corporation readily to finance such purchase. Appellee merely supplied the security by which the finances were obtained. The very checks which he received for the stock when it was turned over to the corporation were used in payment of the loan which he had obtained from the bank. He realized no gain or profit on the transaction. · His relation to the transaction is very aptly described by the District Court:

"* * * that Fox was acquiring said stock on behalf of the corporation and as a temporary expedient, and that when the corporation should accumulate a sufficient surplus and should have available funds, it would take the stock off of Fox's hands. He had no desire or purpose to make a permanent personal investment in the Cross stock."

When we look at the undisputed purpose back of this transaction, together with the "time" and "manner" of this so-called distribution by the corporation

---

[4] Unofficially reported 32 A.F.T.R. 1651.

to appellee, we are of the view that it was not "essentially equivalent to the distribution of a taxable dividend." This is so whether the question be treated as one of fact or of law.

In *John A. Decker*, 32 T.C. 326, affirmed per order by C.A. 6, 286 F. 2d 427, five individuals owned all the stock of a corporation. They entered into an agreement whereby it was agreed that upon the death of one of them, the others would buy the decedent's stock at book value. Upon the death of one stockholder in 1953 and another in 1954, the surviving stockholders purchased the decedents' stock and immediately transferred it to the corporation, which paid them the same amount for the stock they had paid the decedents' estates. The corporation held the stock in the treasury and sold some of it each year thereafter to key employees. We held that in substance the corporation had purchased the stock of the deceased stockholders and that the payments made by the corporation to the surviving stockholders were not essentially equivalent to dividends to them as had been determined by the Commissioner.

In *Erickson* v. *United States*, 189 F. Supp. 521, the District Court for the Southern District of Illinois, upon facts clearly resembling the facts in the instant case, held that a payment by a corporation was not a distribution to the taxpayer essentially equivalent to a dividend under section 301, I.R.C. 1954, and, in its opinion, said:

> The tax consequences of a transaction depend upon the substance of the transaction, and are not to be determined solely from the legal form employed to transfer title. The substance of a transaction must be determined by viewing each step of the transaction in its relationship to the whole. Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S. Ct. 707, 89 L. Ed. 981. In determining the tax consequences of this transaction which culminated in the retirement of the 359 shares of stock, the legal effect of written instruments evidencing a part of the total transaction are not controlling. Ibid. The court must look through the form as represented by such instruments to the substance of the total transaction as evinced by the uncontradicted evidence as a whole. Fox v. Harrison, 7 Cir., 145 F. 2d 521, 522.

To the same effect see *Milton F. Priester*, 38 T.C. 316, and also several Memorandum Opinions of this Court set out in the margin.[5]

Among the cases cited by respondent are *Wall* v. *United States*, 164 F. 2d 462 (C.A. 4, 1947); *Louis H. Zipp*, 28 T.C. 314, affirmed per curiam 259 F. 2d 119 (C.A. 6, 1958); *Schalk Chemical Co.*, 32 T.C. 879; *Robert Deutsch*, 38 T.C. 118; and *Sullivan* v. *United States*, 363 F. 2d 724 (C.A. 8, 1966). Those cases are all distinguishable upon their facts although, due to the peculiar facts in each case, an exceedingly thin line exists between them and the cases relied upon by petitioner. *Wall, Schalk, Deutsch,* and *Sullivan* all were decided upon the ultimate finding that the corporation was fulfilling the obligation

---

[5] The Memorandum Opinions are: *George R. Beggs*, T.C. Memo. 1961–127; *William A. Green*, T.C. Memo. 1963–248; *John McShain*, T.C. Memo. 1963–306; *Robert N. Peterson*, T.C. Memo, 1964–15; and *Dwight Gahm*, T.C. Memo, 1964–118.

of its shareholder, which is opposite to the ultimate finding here. In *Zipp*, the issue of agency was not raised or considered, nor was any evidence introduced to establish that the corporation was fulfilling its own obligation rather than that of its shareholder.

Respondent in effect relies more on form than substance for he picks out certain isolated parts of the evidence to sustain his determination. For instance, the respondent places great emphasis upon the letter Frier and Schor signed on August 26, 1959. In his brief respondent says "This letter leaves no doubt that the plan as of August 26, 1959, was for Schor and Freir to sell their stock to the petitioner rather than to the Corporation." On direct examination, petitioner testified, in part, as follows:

> Here is how this letter came up. Mr. Burdon and Mr. Doran, he is the Vice-President of Northeast National Bank, and Mr. Doran the attorney for the bank said, "Before we approach the Board on this loan, we would like to know that your two partners are willing to sell, that you are not enemies, that you are not fighting amongst yourselves, that if we get the money for the corporation it will not later on—it wouldn't change their minds about it."
>
> This is how the letter came up. I think Doran drafted the letter at that time. And I got the signatures of Irving Schor and George Frier and turned it over to Doran—I mean, to Burdon. * * *

The substance of Frier's testimony regarding the letter was the same as petitioner's. The letter does not truly reflect the understanding of the three shareholders. Although the letter states that delivery of the stock will be made "in accordance with the terms of the agreement entered into between us" no agreement had at that time been entered into. The formal written agreement of September 28, 1959, was not in accord with the so-called understanding stated in the letter. When viewed in the light of all the evidence, we do not regard the letter as too important.

Another isolated piece of evidence emphasized by respondent is taken from the application of the corporation dated August 31, 1959, for the requested loan. The application went into great detail concerning the history of the corporation, its key personnel, its other personnel, its production facilities, future potential, and finally the proposal for the loan. Under the heading of "Key-Personnel" the respondent picks out one sentence as evidencing petitioner's intent personally to purchase the stock of Frier and Schor. The sentence is "When *I* resume operations at Melody *after buying out* the remaining officer-stockholders, Mr. Epstein will have orders, etc." (Emphasis supplied.) Such a literal reading is inconsistent with the balance of the application and the record considered as a whole. If the sentence were to be read as respondent suggests, it would indicate that petitioner intended to resume operation of the corporation's business in his individual capacity, an event which never transpired and

which was not considered at any time. In truth, the language used in the loan application is nothing more than the common tendency of an executive of a closely held corporation to identify himself as synonymous with the corporation. Furthermore, it would seem, if there were no question but what petitioner personally intended to buy out Frier and Schor, the question might well be asked why he did not personally borrow the money from the bank since, as it was, he and his wife had to sign the corporation's note as guarantors. Had this been done, the question before us would never have arisen, as one realizes no income simply by making a purchase.

Respondent also seeks to establish that it was the bank's understanding that the petitioner was to be the purchaser of the stock. This, he argues, shows that the parties intended that the petitioner should buy the stock. The bank was not a party to the agreement to purchase the stock. Its concept of the transaction did not determine the true intention of the actual parties to the agreement. While it is not clear exactly what the bank's concept was, there is no clear evidence that the parties indicated to the bank that their intentions were otherwise than to have the corporation make the purchase. It is believed that even if the bank's concept of the transaction were clear, it would have no bearing on the determination of the intent of the actual parties to the transaction.

Finally, respondent would have us view the stock purchase agreement *as modified* without considering or giving effect to any of the attending facts and circumstances. Not only does he fail to consider what transpired before, during, and after the transaction of October 1, 1959, he even fails to explain or comment upon discrepancies which are apparent on the face of the agreement itself. The respondent would have us accept the agreement without explanation of the alterations made thereon and with complete disregard of the fact, apparent from the agreement itself, that it was initially executed by the corporation as the "Buyer" of the stock. It is hard to imagine a situation where reference to the attending facts and circumstances could be more appropriate or more necessary to a determination of "substance and realities." *Helvering* v. *F. & R. Lazarus & Co., supra.* Petitioner did not select the final form of the transaction. Rather, it was forced upon the parties by the demands of the bank.

We hold that the conduct of the parties before, during, and after the transaction establishes that petitioner was acting solely as agent or conduit for the corporation; that in reality the transaction was intended to be, and was in fact, a purchase by the corporation of the stock of Frier and Schor; that payments made by the corporation to these individuals were in fulfillment of its own obligations and not those of petitioner; and that, accordingly, such payments did not

constitute corporate distributions to the petitioner, constructive or otherwise. *Fox* v. *Harrison, supra.*

Because of some uncontested adjustments,

*Decision will be entered under Rule 50.*