RICHARD B. BENNETT AND LUANNE BENNETT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6790–70.   Filed May 30, 1972.

*James P. Brody, Benjamin F. Garmer III*, and *Joseph R. Barnett,* for the petitioners.

*Matthew W. Stanley, Jr.*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for 1965 in the amount of $47,850.40. The sole issue for decision is whether petitioner Richard B. Bennett, owner of a minority of the shares of a corporation, realized income, taxable under section 301,[1] as the result of a transaction in which the stock ownership of the majority shareholder was terminated.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue.

FINDINGS OF FACT

Richard B. Bennett (hereinafter referred to as petitioner) and Luanne Bennett, husband and wife, were legal residents of Eau Claire, Wis., at the time they filed their petition. They filed a joint Federal income tax return for 1965 with the district director of internal revenue, Milwaukee, Wis.

Petitioner was graduated from the University of Wisconsin at Madison, Wis., in 1948. Thereafter, for about 2 years, he worked for the Coca-Cola Bottling Co. of Bay City, Mich. In 1950, he took a job with the Coca-Cola Bottling Co. of Eau Claire, Inc. (hereinafter the corporation), as a warehouse manager at Menomonee, Wis. About a year later, he moved to Eau Claire and became sales manager of the corporation. Sometime between 1951 and 1956, he was made vice president and general manager of the corporation, and in 1956, he became its president.

Between 1941 and 1946, Robert T. Jones, Jr. (hereinafter Jones), acquired 1,000 of the 1,500 outstanding shares of the voting common stock of the corporation. Prior to September 1, 1965, he had transferred 999 of these shares to various members of his family or to the First National Bank of Atlanta (hereinafter the Atlanta bank) to hold in trust for them; the 1 remaining share was retained by Jones. These 1,000 shares of stock will be hereinafter referred to as the Jones stock or the Jones interest. The remaining 500 shares were, by September 1, 1965, owned by petitioner (275), his wife (5), his mother (104), and his father (116). The directors of the corporation at this time were Jones, Mary Malone Jones, and petitioner.

During 1964, Jones expressed a desire to sell a portion of the stock held by the trusts for members of his family. Initial consideration was given to the immediate purchase by petitioner of 133½ shares of stock and the subsequent redemption of other stock so that petitioner's family would control the corporation. However, Jones was not willing to assume a minority position, and petitioner did not want merely to increase his minority interest in the corporation. The negotiations, therefore, turned to a procedure which would terminate the entire Jones interest.

As early as April 22, 1965, Jones suggested to petitioner that an arrangement whereby the corporation would redeem at least part of the Jones stock would be to petitioner's tax advantage. Through consultations with the corporation's legal counsel and accountant, petitioner learned that the corporation could legally redeem the Jones stock. A price for the Jones interest, based on an objective appraisal, was negotiated, and petitioner contacted two banks and an insurance company in efforts to arrange financing for a corporate redemption.

Petitioner never contemplated purchasing the entire Jones interest for himself, and he did not have enough money or borrowing capacity to enable him to do so.

During the summer of 1965, petitioner received oral assurances from each of the two banks that they would loan the corporation the amount needed to redeem the Jones stock. Thereafter, in late July, petitioner and Jones agreed in principle to the termination of the entire Jones interest at a price of $226,700. During the ensuing discussions as to the details of the transfer, Jones insisted that the transaction take the form of a sale of the stock to petitioner rather than directly to the corporation. He stated that he was concerned that a debt incurred by the corporation to redeem the stock while he was a director might involve him and his wife in an impairment of capital of the corporation for their own benefit and, thereby, cause them to be liable to creditors of the corporation. The transaction took the form which Jones requested; however, Jones was informed in advance that the corporation was to borrow the money required to purchase the Jones interest and immediately redeem the Jones stock.

On August 10, 1965, the First Wisconsin National Bank of Eau Claire, Wis. (hereinafter the Eau Clair bank), formally agreed to loan the corporation $227,000 in order to redeem the Jones stock. This loan was to be secured by mortgages on the real estate, equipment, and machinery of the corporation; personal guaranties by petitioner, his wife, and his father; and an insurance policy on petitioner's life. The Eau Claire bank would not have made this loan to petitioner individually.

By letter dated August 18, 1965, the Jones stock, accompanied by appropriate stock powers, was sent to the Eau Claire bank to be held in escrow until the purchase price of $226,700, less any applicable transfer taxes, had been paid.

On September 1, 1965, meetings of the corporation's board of directors and stockholders were held at the Eau Claire bank. These meetings did not last more than a total of one-half hour. While the directors, the corporation's attorney, Jones' representative, and the Eau Claire bank's representatives were present, petitioner executed on behalf of the corporation a note in the amount of $226,700, together with the agreed mortgage on the real estate and chattel security agreement. The Eau Claire bank deposited $226,700 in the corporation's checking account. The corporation drew a check in the same amount to petitioner. He deposited the check in his checking account and drew a certified check payable to the Atlanta bank in the amount of $226,609.32, the net purchase price of the stock after stock-transfer taxes.

Immediately following these meetings, stock transfers were made

on the books of the corporation to reflect the above-described series of transactions, i.e., the transfer of the Jones shares to petitioner and the retirement of those shares. The certificates for the 1,000 shares of Jones stock were canceled and put in the stock-record book, and one certificate representing those shares was issued to petitioner and immediately canceled and redeemed by the corporation. Stock-transfer stamps were affixed to each certificate.

The minutes of these meetings reflect that they were held for the purpose of considering the purchase and retirement of 1,000 shares of stock, the borrowing of $226,700 from the Eau Claire bank to finance such purchase, and the execution of required security agreements. The minutes of the board of directors meeting reflect that there was presented a "Waiver of Notice and Consent to the transaction of any business that might come before the meeting," signed by Jones and Mary Malone Jones. The minutes of the stockholders meeting reflect that all 1,500 outstanding shares of stock were represented and that petitioner voted the Jones stock. Such minutes also reflect that the officers and board of directors of the corporation were authorized to "retire 1,000 shares of stock in * * * [the corporation], now held in the name of * * * [petitioner] upon the books of this corporation," and in order to finance the redemption the officers and directors were authorized to borrow the necessary funds from the Eau Claire bank.

Upon the completion of this series of events, petitioner, his wife, his mother, and his father continued to own their 500 shares of stock in the same proportions as they had before the redemption. A new board of directors was elected, composed of petitioner, his wife, his mother, and his father. The 1,000 shares of stock previously owned by the Jones group were held as treasury stock.

Respondent determined that petitioner "realized a taxable dividend in the amount of $92,649.66 during the calendar year 1965 with regard to the redemption by the Coca-Cola Bottling Company of Eau Claire, Inc. of one-thousand shares of its capital stock from * * * [him] on September 1, 1965."

OPINION

Respondent has taken the position that petitioner received a distribution "essentially equivalent to a dividend" within the meaning of section 301(a)[2] or section 302(b)(1)[3] in the transaction in which the

---

[2] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—* * * a distribution of property * * * made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). [I.e., as a dividend to the extent of earnings and profits.]

[3] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

Jones stock was redeemed. Petitioner contends that he was a mere conduit or agent through which the corporation redeemed the stock owned by the Jones interest and that he did not, therefore, realize taxable income from the transaction. The issue is basically factual, and we hold for petitioner.

Respondent seeks to support his determination on two theories. First, he argues that petitioner initially obligated himself personally to buy the Jones stock, and that he realized income when the corporation distributed to him the money required to discharge that obligation. See, e.g., *Sullivan* v. *United States*, 363 F. 2d 724 (C.A. 8, 1966), certiorari denied 387 U.S. 905 (1967); *Wall* v. *United States*, 164 F. 2d 462 (C.A. 4, 1947); *Louis H. Zipp*, 28 T.C. 314 (1957), affirmed per curiam 259 F. 2d 119 (C.A. 6, 1958), certiorari denied 359 U.S. 934 (1959), acq. 1957-2 C.B. 7. Second, respondent contends that, since section 318(a) (1)[4] attributes to petitioner the ownership of all the Bennett family stock, petitioner is to be treated as the sole shareholder of the corporation during the moment when the stock certificate covering the Jones stock stood in his name and the corporation issued its $226,700 check to him; on this factual premise, respondent invokes the rule that as a matter of law any distribution by a corporation to its sole shareholder is essentially equivalent to a dividend. See, e.g., *United States* v. *Davis*, 397 U.S. 301 (1970), rehearing denied 397 U.S. 1071 (1970); *Estate of William F. Runnels*, 54 T.C. 762 (1970).

As we view the evidence, however, the facts do not support either of respondent's positions. We do not think petitioner, in his individual capacity, ever became obligated to pay for the Jones stock or ever acquired ownership of such stock. The delivery of corporate funds to petitioner to pay Jones for the stock did not involve a discharge of petitioner's personal obligation or a distribution to him with respect to his stock. Rather, the corporation's disbursement involved a payment pursuant to a prearranged plan for the redemption of the Jones stock.

The evidence shows that Jones, after about July 23, 1965, insisted that the transaction take the form of a transfer of the Jones stock to petitioner. He was concerned that he might become involved in claims by creditors of the corporation based on an impairment of its capital in a transaction in which he was beneficially interested. He wanted the paper record to reflect that petitioner, rather than the cor-

---

[4] SEC. 318. CONSTRUCTIVE OWNERSHIP OF STOCK.

(a) GENERAL RULE.—For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—

    (1) MEMBERS OF FAMILY.—

        (A) In general.—An individual shall be considered as owning the stock owned, directly or indirectly, by or for—

            (i) his spouse (other than a spouse who is legally separated from the individual under a decree of divorce or separate maintenance), and

            (ii) his children, grandchildren, and parents.

poration, had bought the stock; otherwise, it appears that he did not care how the transaction was handled.

Though insisting that the transaction take the form of a purchase by petitioner, Jones was aware that petitioner did not intend to acquire the stock for himself but rather the corporation was to redeem it. As early as April 22, 1965, in a letter to petitioner, Jones suggested the tax advantages of having the corporation acquire part of the stock. In telephone conversations between petitioner, his attorney, and Jones, the details of the transaction were prearranged. Indeed, under date of September 2, 1965, Jones transmitted, on behalf of himself and Mary Malone Jones, a waiver to the holding of the board of directors meeting at which the transaction was consummated, expressing the hope, nevertheless, that the waiver would not be needed lest he be subjected to possible liability for impairing the corporation's capital.

That petitioner was acting on behalf of the corporation in arranging to acquire the stock is further demonstrated by his lack of both the funds and the borrowing capacity personally to pay a sum equal to the value of the stock. The Eau Claire bank made the $226,700 loan to the corporation, secured by mortgages on its property, for the specific purpose of providing the funds needed to redeem the 1,000 shares of Jones stock. The escrow agent for the Jones stock was not authorized to deliver it until the $226,700 had been paid, and the payment could not have been made until the bank advanced the funds. Jones had been associated with petitioner for several years in the ownership and management of the corporation, and the negotiations preceding the retirement of the Jones stock spanned a period of several months. Jones knew, at least generally, petitioner's financial situation. In one of the stipulated letters addressed to petitioner, Jones offered to arrange an appointment for petitioner to meet with officials of a bank in Atlanta for the purpose of attempting to arrange a loan to finance the stock purchase. The only reasonable inference is that Jones was aware that petitioner could not have personally financed the purchase of the stock.

Had petitioner declined at the last minute to go through with the transaction, we do not think Jones would have had any enforceable personal claim against petitioner for the agreed redemption price. Petitioner neither signed any agreement nor made any oral commitment personally to pay for the stock. At the 30-minute meeting when the prearranged transaction was consummated, petitioner merely served as a conduit through which the stock passed from the Jones group to the corporation and the payment therefor passed from the corporation to Jones.

Petitioner realized no financial or economic gain from the redemption of the stock. The redemption price, negotiated in the light of an

appraisal by an expert satisfactory to both parties, represented the fair market value of the stock. Prior to the transaction, petitioner (and other members of his family) owned only one-third of the corporation's stock. After the redemption, petitioner (and his family) owned all the stock, but the value of their stock interest had not increased. While petitioner and his family gained control of the corporation and may ultimately realize greater income, such did not occur in the tax year. See, e.g., *Niederkrome* v. *Commissioner*, 266 F. 2d 238, 243 (C.A. 9, 1958) ; *Holsey* v. *Commissioner*, 258 F. 2d 865 (C.A. 3, 1958) ; *Milton F. Priester*, 38 T.C. 316, 326 (1962).

The words of this Court in *Frank Ciaio*, 47 T.C. 447, 458 (1967), acq. 1967–2 C.B. 2—a case involving similar facts—are apposite:

> The real substance of the transaction is, in our opinion, perfectly clear. The transaction was simply and purely a purchase by the corporation of the stock of * * * [the retiring shareholders], using the petitioner as its instrument. * * * [The retiring shareholders] got the cash. Petitioner received nothing from the transaction except a proportionate increase in the reduced assets of the corporation. He started out, in effect, with 33⅓ percent of 100 percent and ended up with 100 percent of 33⅓ percent.

Also analogous is *Fox* v. *Harrison*, 145 F. 2d 521 (C.A. 7, 1944), where the taxpayer owned one-third and Cross owned two-thirds of a corporation's stock. The taxpayer obtained a loan and paid Cross for his stock. The corporation then paid the taxpayer for the stock, and he applied such payment on the loan. Holding the payment of the loan was not essentially equivalent to a dividend, the court said (pp. 522–523) :

> In reality, the involved stock was purchased by the corporation from Cross. That the purchase was not made directly from him was due to the inability of the corporation readily to finance such purchase. Appellee merely supplied the security by which the finances were obtained. The very checks which he received for the stock when it was turned over to the corporation were used in payment of the loan which he had obtained from the bank. He realized no gain or profit on the transaction. His relation to the transaction is very aptly described by the District Court:
>
> "* * * that Fox was acquiring said stock on behalf of the corporation and as a temporary expedient, and that when the corporation should accumulate a sufficient surplus and should have available funds, it would take the stock off of Fox's hands. He had no desire or purpose to make a permanent personal investment in the Cross stock."

Since petitioner personally did not incur a primary obligation to pay for the Jones stock and personally did not acquire beneficial ownership of it, we do not think either of respondent's theories has merit. In supplying the funds to redeem the Jones stock, the corporation did not discharge an obligation of petitioner because he never obligated himself personally to purchase the stock. And although the certificate for the 1,000 shares of Jones stock stood momentarily in

petitioner's name, petitioner did not beneficially own the stock even during that fleeting moment, and it was not redeemed from him in his individual capacity. Thus, under neither of respondent's theories was there a distribution essentially equivalent to a dividend.[5] See *John A. Decker*, 32 T.C. 326, 333 (1959), affirmed per curiam 286 F. 2d 427 (C.A. 6, 1960) ; *Arthur J. Kobacker*, 37 T.C. 882, 895 (1962), acq. 1964–2 C.B. 6 ; *Ray Edenfield*, 19 T.C. 13, 20–21 (1952), acq. 1953–1 C.B. 4 ; *Hargleroad* v. *United States*, 202 F. Supp. 92, 95 (D. Neb. 1962) ; *Erickson* v. *United States*, 189 F. Supp. 521, 524 (S.D. Ill. 1960).[6]

Respondent relies heavily upon *Wall* v. *United States, supra*. In that case, the taxpayer gave cash and notes for another shareholder's 50-percent interest in a dairy company. The taxpayer made the payment on the first note. The dairy company subsequently agreed, in return for the purchased stock, to pay the remaining notes as they matured, and did so. The court reasoned that (p. 464) :

if a corporation, instead of paying a dividend to a stockholder, pays a debt for him out of its surplus, it is the same for tax purposes as if the corporation pays a dividend to a stockholder, and the stockholder then utilizes it to pay his debt.

Respondent argues that the facts are the same in the present case as in *Wall* except that the events in the latter case occurred in "slow motion." We do not agree. The differences are much more fundamental, and the cases are clearly distinguishable. In *Wall*, the taxpayer in one transaction acquired stock, paid an amount of cash, and obligated himself personally to pay additional amounts ; in a subsequent, separate transaction the corporation paid the notes. In contrast, petitioner never intended to acquire personal ownership of the Jones stock and never incurred any personal obligation to do so ; at all times, he was serving as a conduit or agent for the corporation in a single, integrated transaction in which it acquired the stock. The court, in *Wall*, distinguished *Fox* v. *Harrison, supra*, stating at page 466, "Wall deliberately elected to attain his objective by two distinct transactions and there is no evidence that he was merely acting as an agent for * * * [the dairy

---

[5] The general issue here presented has been frequently litigated, and respondent has prevailed in many of these cases. See, e.g., *Sullivan* v. *United States*, 363 F. 2d 724 (C.A. 8, 1966) ; *Woodworth* v. *Commissioner*, 218 F. 2d 719 (C.A. 6, 1955), affirming a Memorandum Opinion of this Court ; *Lowenthal* v. *Commissioner*, 169 F. 2d 694 (C.A. 7, 1948), affirming a Memorandum Opinion of this Court ; *William K. Edmister*, 46 T.C. 651 (1966), affirmed per curiam 391 F. 2d 584 (C.A. 6, 1968) ; *Aloysius J. McGinty*, 38 T.C. 882 (1962), affd. 325 F. 2d 820 (C.A. 2, 1963) ; *Frank P. Holloway*, a Memorandum Opinion of this Court dated Dec. 12, 1951, 10 T.C.M. 1257, affirmed per curiam 203 F. 2d 566 (C.A. 6, 1953). All of these cases are distinguishable on their facts.

[6] See also *Herbert Enoch*, 57 T.C. 781 (1972) ; *W. P. Bunton, Sr.*, T.C. Memo. 1968–3, 27 T.C.M. 9 ; *Robert N. Peterson*, T.C. Memo. 1964–15, 23 T.C.M. 63 ; *William A. Green*, T.C. Memo. 1963–248, 22 T.C.M. 1241.

company] when he made the purchase." The same observation serves to distinguish *Wall* from the instant case.

Respondent also urges that Jones would not have assented to the transaction if petitioner had not agreed to allow it to take the form of a purchase of the stock from him and, on this ground, insists that we are precluded from holding that the arrangement was a redemption from Jones. However, in any transaction where the form differs from the substance, such difference is presumably dictated by someone who has the power to change the natural form of the transaction. The fact that the one causing such a change has the power to prevent the transaction from occurring in any other way is not sufficient, in itself, to show that the form chosen reflects the substance of the transaction. Indeed, we do not understand respondent to seriously advocate such a rule. See, e.g., *Gregory* v. *Helvering*, 293 U.S. 465 (1935). We are unable to give controlling weight to Jones' request that the transaction not be handled as a redemption from him. See *Hargleroad* v. *United States, supra* at 95.

We hold on the facts here presented that petitioner did not receive a distribution from the corporation which was essentially equivalent to a dividend.

*Decision will be entered for the petitioners.*

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.