JOHN K. GORDON and DEAN S. GORDON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gordon v. Commissioner
Docket No. 1480-73.
United States Tax Court
T.C. Memo 1975-86; 1975 Tax Ct. Memo LEXIS 287; 34 T.C.M. (CCH) 437; T.C.M. (RIA) 750086; March 31, 1975, Filed *287 Donald W. Pemberton, for the petitioners. Jack D. Yarbrough and Robert B. Nadler, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1966 in the amount of $14,978.98. The only issue for our decision is whether petitioners received a constructive dividend from a discharge of the obligation of John K. Gordon by a corporation in which he owned 51 percent of the stock when that corporation acquired the 49 percent interest owned by his former wife. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. John K. Gordon (John) and Dean S. Gordon, husband and wife, who at the time of the filing of the petition in this case resided in Memphis, Tennessee, filed their joint Federal income tax return for the calendar year 1966 with the Southeast Service Center, Chamblee, Georgia. John was formerly married to Mary Elinor Colbert Gordon (Elinor). In January 1965, John filed suit for divorce from Elinor. John and Elinor were each represented by counsel. Their respective attorneys conducted negotiations leading to an *288 alimony and property settlement agreement which was dated January 6, 1966, and signed by John and Elinor. During the negotiations John's attorney wrote a letter, dated October 28, 1965, to Elinor's attorney, stating in part the following: The corporation mentioned to you is Grove Park Service Company. The stock is held equally by Mr. and Mrs. Gordon. A balance sheet on this corporation as of October 9, 1965, is as follows: BALANCE SHEET Cash
83,734.78
Rent receivable
461.55
Ten 1959 White tractors
29,629.04
Total assets
113,825.37
Liabilities
Federal Income Tax
4,100.00
Earned surplus and profit
108,225.37
Capital stock
1,500.00
113,825.37
As you can see from the above balance sheet, the net worth of this company is approximately $110,000.00 assuming that the ten White tractors have the value assigned. This is doubtful because these trucks have been fully depreciated to the extent allowable under the Federal Income Tax law. In order to get the value out of this corporation the shareholders would have to pay at least capital gains taxes which would amount to approximately $30,000.00 leaving approximately $80,000.00 in value, provided the *289 only tax liability is on a capital gains basis. This would mean approximately $80,000.00 would be the net amount available to stockholders. Upon the assumption that this is an accurate figure, Mr. Gordon would pay one-half of that amount or $40,000.00, to Mrs. Gordon for her stock. The "Alimony and Property Settlement Agreement," dated January 6, 1966, executed by John and Elinor provided in part as follows: WHEREAS, an action for divorce is now pending between the parties in the Chancery Court of Shelby County, Tennessee, in Cause No. 67668-3 R.D.; WHEREAS, in the event a decree for divorce is entered and the marriage of the parties is dissolved, the parties are desirous of settling all rights to alimony and the rights of each of the parties in the property of the other or in jointly owned property, and of fixing the custody of the children of the parties and their support. NOW, THEREFORE, in the event and upon condition that a decree for divorce is entered dissolving the marriage existing between the parties, the parties hereto do hereby agree: (1) That Husband will pay to Wife the sum of Five Hundred Dollars ($500.00) per month as alimony, which payments shall continue *290 throughout the life of Mary Elinor Colbert Gordon, or until the death of Husband; (2) Husband shall pay to Wife the sum of Forty-Five Thousand Dollars ($45,000.00) in cash for all of Wife's stock in Grove Park Service Company, which payment shall be in full satisfaction of all of Wife's interest of any kind or character whatsoever in said corporation. This obligation may be discharged by Husband by the corporation redeeming Wife's stock for the sum of Forty-Five Thousand Dollars ($45,000.00); (3) Wife's interest in the home of the parties known as 274 Grove Park Road, Memphis, Shelby County, Tennessee, shall be divested out of Mary Elinor Colbert Gordon and vested absolutely and in fee simple in Husband, John K. Gordon, in consideration of which John K. Gordon will pay Wife the sum of Twenty-Five Hundred Dollars ($2,500.00) in cash and shall execute a note in the principal sum of Twelve Thousand Five Hundred Dollars ($12,500.00) due ten (10) years from the date of the entry of divorce decree with interest at six per cent (6%) per annum payable annually to Wife or the holder of the note. Husband shall have the right to prepay this note or any part thereof at his option; (4) Husband *291 shall have custody of the children of the parties heretofore named and shall support said children, but Wife shall have the right to have the children visit with her at reasonable times. The right to change the custody of the children shall be retained by the Court and shall be subject to the future orders of the Court; (5) Husband shall have title to all furnishings in the property known as 274 Grove Park Road, Memphis, Tennessee, with the exception that Wife shall be entitled to all wedding gifts, items that she needs for her personal use and items of personal property for which she has a sentimental attachment; (6) The automobile which was used by Wife until she was hospitalized commencing on or about January 3, 1965, shall be her absolute property. It is understood and agreed that upon entry of a divorce decree dissolving the marriage that this agreement shall be incorporated in such decree, and that each party hereto will execute all documents, instruments, deeds and contracts necessary to effectuate the purposes stated herein. It is further understood and agreed that neither of the parties hereto shall have any other rights in any property of the other except as herein *292 expressly stated, and that this agreement is a final and complete settlement of all marital rights or other rights in property which either of the parties now has or may hereafter have. Prior to its execution the language used in the agreement was approved by John and his attorney. On January 27, 1966, John was granted a divorce from Elinor by a decree of the Chancery Court of Shelby County, Tennessee. The order and decree incorporated and quoted in full "in words and figures" the alimony and property settlement agreement and "ratified, approved and confirmed" that agreement. The corporation, Grove Park Service Company (Grove), which was referred to in the alimony and property settlement agreement, was one of six corporations formed in 1959 by the stockholders of Gordon's Transports, Incorporated (Gordon's), an interstate motor freight carrier. Gordon's was controlled by John, his mother, his father until his father's death in 1963, his two brothers, and his two sisters. To expand its operations by acquiring other trucking companies, Gordon's needed the approval of the Interstate Commerce Commission. To comply with the Commission's requirements regarding the amount of indebtedness *293 which may be carried by the acquiring corporation, on advice of counsel, John, his brothers and sisters and their respective spouses, and his parents formed six corporations to buy tractors to lease to Gordon's. One of the six corporations was owned by John's mother and father, one by each of his two sisters and her husband, one by each of his two brothers and his wife, and one, Grove, by John and Elinor. From Grove's inception in 1959 until early 1966 when Grove acquired Elinor's interest, John owned 153 shares and Elinor owned 147 shares of Grove. Each of the six corporations purchased ten tractors, and the total indebtedness of the six companies for the 60 tractors was in excess of $2 million. During 1959 through 1966 Gordon's leased these tractors from the six affiliated corporations and expanded its operations from the Mississippi Valley into Texas, Georgia, Louisiana, Kansas, Alabama, Ohio, Indiana, Illinois, West Virginia, and Minnesota. By 1966 Gordon's was operating approximately 300 tractors. The rent that Grove received from Gordon's was applied to its indebtedness which was completely satisfied sometime prior to April 1962, and Grove then began to accumulate funds. *294 Grove never paid a dividend and was liquidated in late 1966 along with its affiliated corporations. John did not participate in the negotiations with Elinor or her attorney in arriving at the alimony and property settlement agreement. However, from statements made to him by his attorney he believed that Elinor's attorney wanted approximately half of the cash in Grove's account for her minority interest in the corporation. In late 1965 Grove's cash position was approximately $90,000. John participated in discussions about several ways in which Elinor might receive half the cash in Grove for her stocks. Someone prior to the execution of the alimony and property settlement agreement suggested that this could be done by redemption and from the time this suggestion was made it was John's understanding that this would be done. During 1966 John earned approximately $73,000 as an officer of Gordon's. At that time he could have borrowed sufficient funds to purchase his former wife's shares in Grove, assuming he found it necessary. An accounting firm, which prepared Grove's and Gordon's corporate tax returns, John's personal tax returns, and annually audited Gordon's books, kept Grove's *295 accounting records and checkbook. Grove's checking account had three authorized signatories, a member of the accounting firm, and the comptroller and assistant comptroller of Gordon's. Generally the accounting firm prepared Grove's checks which it then sent to the comptroller and assistant comptroller of Gordon's for their signatures. In connection with the check eventually given to Elinor for her Grove shares, the firm sent to Gordon's comptroller on or about January 20, 1966, a check on the Grove account with only the number of the check filled in, as the person in the firm preparing the check did not know to whom the check was to be payable or what amount was involved. The comptroller and the assistant comptroller of Gordon's signed their names to the check. On January 28, 1966, John entered on the check that day's date, Elinor as the payee, and $45,000 as the amount payable to her. He delivered the check to his attorney who in turn gave it to Elinor's attorney who then drove to Elinor's home and handed it to her. Elinor negotiated the check that same day. This check was tendered and accepted as consideration for and satisfaction of Elinor's interest in Grove. At some point in time *296 shortly thereafter, Elinor endorsed in blank and had delivered to the corporation her certificate for 147 shares of Grove stock. The stockbook and stock certificates of Grove were kept in the corporate offices of Grove or in those of Gordon's. As of January 29, 1966, Grove showed on its balance sheet 300 shares of stock issued and outstanding and of this number of shares it held 147 shares as treasury stock as of February 26, 1966. In its 1966 corporate income tax return, Grove reported its reacquisition of Elinor's 147 common shares at a premium of $44,265 and a distribution to John on its liquidation in December 29, 1966, of $57,438.35 in cash and $27,500 in property. Elinor on her Federal income tax return for 1966 reported her gain from Grove's acquisition of her shares of stock as capital gain. The only mention made in any minutes of meetings of stockholders or directors of Grove of acquisition of Elinor's stock was at a special meeting of the shareholders of Grove and at a separate special meeting of the board of directors of Grove both held on January 28, 1966. At each of these meetings, the chairman of the meeting announced that due to the circumstances of the divorce *297 of the only two shareholders of the corporation, Elinor desired to have her interest in the corporation redeemed for $45,000. All board members and shareholders, in their respective meetings, unanimously approved and authorized the president to redeem her stock. John and Dean Gordon did not report on their joint Federal income tax return for 1966 any income from Grove's acquisition of Elinor's stock and in reporting the liquidating distribution from Grove as long-term capital gain in that return did not increase the basis of their stock by any amount because of this transaction. Respondent in his notice of deficiency dtermined that John had an unconditional primary obligation to purchase the 147 shares of stock in Grove from Elinor for $45,000 and that his use of corporate earnings to satisfy his obligation constituted a taxable dividend to him when Grove paid Elinor $45,000 for her 147 shares of that corporation's stock. Respondent, accordingly, increased John's income as reported by a $45,000 dividend and reduced John's reported long-term capital gain on the liquidating distribution by increasing his basis in the shares of stock he retained by $45,000. OPINION Both parties *298 recognize that the question here is factual. The parties agree that if John was unconditionally and primarily legally obligated to purchase Elinor's shares of stock in Grove, and Grove redeemed those shares relieving him of that obligation, John received a constructive taxable dividend from Grove in the amount of $45,000. The facts show and the parties agree that Grove had sufficient earnings and profits available for a $45,000 dividend distribution. The circumstances under which a corporate reacquisition of shares of stock owned by a particular shareholder results in taxable dividend income to the remaining shareholder or shareholders is well settled. This Court stated in Thomas C. Stephens,60 T.C. 1004, 1011 (1973), affd. 506 F. 2d 1400 (C.A. 6, 1974), the following: The question of whether a redemption of stock owned by one shareholder is income to the remaining shareholders has been the subject of much litigation. The courts have uniformly held that where a corporation redeems stock which its remaining shareholder was obligated to buy, the remaining shareholder has received a taxable dividend in the amount of the redemption price to the extent *299 that such price does not exceed the corporate earnings and profits available for payment of dividends. Sullivan v. United States,363 F. 2d 724 (C.A. 8, 1966), certiorari denied 387 U.S. 905 (1967); Wall v. United States,164 F. 2d 462 (C.A. 4, 1947). See also Zipp v. Commissioner,259 F. 2d 119 (C.A. 6, 1958), affirming per curiam 28 T.C. 314 (1957). However absent an obligation of the remaining shareholders to purchase the stock of another shareholder, an authorized corporate redemption of one shareholder's stock does not result in a taxable dividend to the remaining shareholders due to their increased interest in the reduced assets of the corporation. Richard B. Bennett,58 T.C. 381 (1972). Petitioners contend that John was not primarily and unconditionally obligated to purchase Elinor's Grove shares but had an alternative or optional obligation to purchase those shares or cause them to be redeemed. Petitioners contend that such an alternative obligation does not result in a dividend to the remaining shareholder when the other shareholder's stock is redeemed by the corporation, *300 relying on S. K. Ames, Inc.,46 B.T.A. 1020 (1942), and Rev. Rul. 59-286, 1959-2 C.B. 103. Alternatively petitioners argue that John had no obligation to purchase Elinor's stock, although the settlement may generally have so provided, since before the settlement agreement was entered into the intent of the parties and their attorneys was that the corporation redeem the shares.[1]
Respondent contends that John had an unconditional legal obligation to purchase Elinor's stock for $45,000 pursuant to the alimony and property settlement agreement which was incorporated into the divorce decree. At most, respondent concedes that John had the right to choose whether he would purchase the stock or have the corporation redeem it, but in any event his position is that John had a primary obligation to purchase Elinor's stock and that this was discharged by Grove purchasing the stock. The factual *301 issue here is whether John had a personal liability to Elinor for $45,000 which was discharged by the use of Grove's funds in the acquisition of Elinor's shares. After consideration of all the facts of record, we conclude that John had a primary unconditional legal obligation to pay Elinor $45,000 for her Grove stock and that John's obligation was satisfied by Grove's acquisition of her stock for $45,000. The alimony and property settlement agreement dated January 6, 1966, is not ambiguous but clearly provides that John was obligated to pay Elinor the amount of $45,000 for her shares of stock in Grove. The divorce court incorporated this agreement and its underlying obligations, including John's purchase of Elinor's Grove stock, into its decree of divorce dated January 27, 1966. There is no claim or evidence which would vitiate the agreement and the decree of divorce has not been directly attacked or its execution enjoined on equitable grounds. Petitioners' contention that the parties made a mutual mistake and that the agreement did not reflect their intent is not supported by the evidence. The terms of the agreement are complete and clear and there is no evidence that Elinor *302 or her attorney contemplated that Grove and not John was to purchase her shares. The record before us is totally at variance with that in the Memorandum Opinion of this Court relied on by petitioners. In that case we specifically found that the taxpayer had no personal obligation to purchase the stock redeemed by the corporation. The facts showed that there was a corporate resolution authorizing the redemption of the wife's shares passed prior to the execution of the property settlement agreement and that the agreement reached between the parties was that the corporation would redeem the wife's shares. Under the facts here, there is no evidence that John acted on the corporation's behalf in binding himself to buy Elinor's shares. Elinor's and John's attorneys' intent with respect to the purchase of the shares was that John had the obligation to buy her Grove shares, which obligation could be discharged by Grove for John's benefit. Not only does the agreement plainly so state, but John's attorney's letter to Elinor's attorney supports our conclusion. This letter is, in effect, an offer to buy the Grove stockholdings of Elinor for the amount of $40,000, which John's attorney considered *303 to be their worth. Petitioners' reliance on S. K. Ames, Inc.,supra, and Rev. Rul. 59-286, supra, is misplaced. In Ames we found that the taxpayer-corporation did not have an absolute binding obligation to purchase the stock and held that the purchase of such stock by its controlled corporation was not income to it. We pointed out that the taxpayer-corporation's obligation was not an unconditional obligation to purchase the stock but the obligation, by its very terms, had several alternative modes of satisfaction, one of which was that a third party might buy the stock. Similarly, in Rev. Rul. 59-286, supra, the remaining shareholder of the corporation did not have an unconditional obligation to purchase his deceased brother's stock but an obligation to purchase his brother's stock or vote his own stock for liquidation. The ruling found this agreement did not obligate the remaining stockholder to buy the deceased stockholder's shares and consequently the redemption of those shares by the corporation was not income to the remaining shareholder. The facts in the Ames case and Rev. Rul. 59-286 are distinguishable *304 from those in the instant case. In both the Ames case and the revenue ruling, the obligation of the taxpayer to purchase the stock involved was alternative to other courses of action. The facts of this case are otherwise. John's obligation to buy Elinor's shares of stock in Grove was unconditional even though the parties agreed that this obligation of John's could be satisfied by the purchase of these shares by the corporation. The agreement states: "This obligation may be discharged by Husband by the corporation redeeming Wife's stock." This is not an alternative obligation to that of John's obligation to purchase his former wife's Grove shares. It is a method whereby his obligation to buy the shares may be discharged. On the facts present in this case, we conclude that John had an unconditional primary obligation to purchase Elinor's stock in Grove prior to the time of its redemption by the corporation, and, accordingly, we hold that the discharge of John's personal obligation to buy his former wife's shares of Grove stock resulted in dividend income to him in the amount that Grove paid for the stock. Decision will be entered for respondent.
Footnotes
1. Petitioners rely on a Memorandum Opinion of this Court, Wayne B. Nichols,T.C. Memo. 1973-114↩, to support their contention that where an agreement does not recite the true agreement of the parties, the true agreement may be shown by other evidence.