CLARK D. PULLIAM and JANIS L. PULLIAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; PULLIAM FUNERAL HOMES, P.C., A CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pulliam v. Commissioner
Docket Nos. 29725-81, 30025-81.
United States Tax Court
T.C. Memo 1984-470; 1984 Tax Ct. Memo LEXIS 206; 48 T.C.M. (CCH) 1019; T.C.M. (RIA) 84470; September 4, 1984. *206 Held, payment by corporation to shareholders pursuant to stock purchase agreement did not relieve remaining shareholder of binding obligation to purchase the stock, and thus did not constitute constructive dividend to him. Held further, deduction by corporation of interest paid pursuant to purchase of stock upheld. Frank J. Weber and Marvin J. Frank, for the petitioners. Elsie Hall and Robert D. Kaiser, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: In these consolidated cases respondent has determined deficiencies in petitioners' Federal income taxes as follows: Petitioner
Year Ended
Deficiency
Clark D. Pulliam and
Janis L. Pulliam December 31, 1978
$40,018.71
Pulliam Funeral Homes,
P.C.
December 31, 1978
3,872.00
The issues for decision are: (1) whether payments by Pulliam Funeral Homes, P.C. in exchange for the stock interests of several shareholders relieved Clark D. Pulliam of a binding obligation to purchase the stock, and thus constituted a constructive dividend to him, and (2) whether Pulliam Funeral Homes, P.C. may deduct the interest it paid to the selling shareholders as part of the purchase price. FINDINGS OF FACT Some of the facts have been *207 stipulated by the parties and are found accordingly. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioners Clark D. Pulliam and Janis L. Pulliam are husband and wife who resided in Robinson, Illinois when they filed their petition in this case. They timely filed a joint Federal income tax return for the calendar year 1978 with the Internal Revenue Service. Pulliam Funeral Homes, P.C. (the corporation) is a professional dorporation incorporated under the laws of Illinois. At all times pertinent to this case, the corporation maintained its principal office in Robinson, Illinois. The corporation timely filed a Federal corporate income tax return for the calendar year 1978 with the Internal Revenue Service. Troy Pulliam, Jr. was the father of petitioner Clark D. Pulliam (Clark). Troy Pulliam, Jr. died on August 10, 1976 as the result of a stroke. At the date of his death, Troy Pulliam, Jr. owned all 1,000 shares of the outstanding common stock of the corporation, and was solely responsible for its management. He was survived by his wife, Beulah Pulliam (Clark's stepmother), by Clark, who was then 29 years old, and by three children born of *208 his marriage with Beulah: Karen, then age 22, Brent, then age 20, and Scott, then age 19. At the time of Troy Pulliam, Jr.'s death, Illinois law provided that: No [professional service] corporation * * * may issue any of its capital stock to anyone other than an individual who is duly licensed or otherwise legally authorized to render the same specific professional services or related professional services as those for which the corporation was organized. * * * [Ill. Ann. Stat., ch.32, sec. 415-11 (Smith-Hurd 1983) (effective Oct. 1, 1973).] Clark was the only member of the Pulliam family who was then licensed to act as a funeral director in Illinois. Clark had worked in the funeral business since he was a child.He was graduated from the Indiana College of Mortuary Sciences in 1973, and subsequently passed both national and Illinois state board examinations in order to become licensed to act as a funeral director and embalmer. In 1974, after a one-year apprenticeship with his father, he received the license, and he continued to work in his father's business thereafter. After the death of Troy Pulliam, Jr., his last will and testament was admitted for probate. The will made the *209 following disposition of the stock of the corporation: Third. I give and bequeath equally all of my common stock in Pulliam Funeral Homes, P.C. which includes the going business and all of its assets, to my wife, Beulah R. Pulliam and to my children, Clark D. Pulliam, Karen E. Pulliam, Brent A. Pulliam and Scott F. Pulliam. Any beneficiary who is not a licensed Funeral Director shall be required to place the stock ownership in the name of Clark D. Pulliam and be paid a sum in cash for their proportionate share of stock based upon the fair market value of said corporation. The value of said stock shall be arrived at by three appraisers, one to be selected by Clark D. Pulliam, one to be selected by the selling party or parties and the third to be selected by the other two appraisers. If any of the other beneficiaries other than Clark D. Pulliam are licensed Funeral Directors or if they become come licensed Funeral Directors, Clark D. Pulliam shall share equally with the other licensed beneficiaries his stock ownership in order that all of said Funeral Directors shall share equally in said corporation. Any purchasing beneficiary must pay for the stock at its fair market value at *210 the time of purchase with said fair market value to be determined by appraisal as provided for above. * * * Clark and his stepmother, Beulah Pulliam, were named as co-executors in the will. Their attempts to dispose of the stock in accordance with the terms of the will were unsuccessful, and relations between Clark, his stepmother, and the other children became strained. Mrs. Pulliam therefore engaged the services of an attorney to represent her and her children in the negotiations. The will provided that any beneficiary who became a licensed funeral director would be entitled to share equally in the corporation. In 1977 and 1978, neither Karen, Brent nor Scott Pulliam had yet decided whether they might want to become funeral directors, and they were unwilling to relinquish their options to enter into the business in the future. Karen, in fact, entered the College of Mortuary Sciences in Indianapolis in 1977, but although she was graduated from the college, she never took the state board examination required to obtain a funeral director's license. In the summer or fall of 1977, the corporation received a letter from the state of Illinois questioning the licensure of the corporation *211 because, contrary to Illinois law, the stock appeared to be held by persons other than licensed funeral directors. Subsequently, the sellers agreed upon a tentative price for their stock. Clark then attempted to obtain personal financing in order to purchase the stock. He applied for a loan from the First National Bank of Oblong, Illinois, but was denied credit. Because Clark had been denied personal credit, Richard Roth, a certified public accountant employed by the corporation, attempted to secure financing to enable the corporation to make the purchase. A loan to the corporation in the amount of $193,600 was ultimately approved by the First National Bank in Robinson. The attorney representing Beulah Pulliam and her children was informed that the corporation had obtained funds with which to purchase their stock. In addition, he received a copy of a letter from the bank which stated that the loan had been made to the corporation. On March 27, 1978 Clark met with David L. Musgrave, president of the First National Bank in Robinson (the bank) in order to execute the loan agreement. [1] At that meeting, Clark signed a promissory note in the amount of $193,600 on behalf of the corporation. *212 The bank took a security interest in the corporation's accounts receivable, inventory, and equipment. Clark assigned his life insurance policy to the bank, and he and his wife personally guaranteed payment of the promissory note. The corporation has since made all payments on the loan. Later that day, Clark and Mr. Musgrave met with Beulah, Karen, Brent and Scott Pulliam in order to complete the stock sale. Also present at the meeting was the attorney retained by Beulah, and the attorney retained by Clark. At the meeting, the bank, using the proceeds of the loan to the corporation, issued checks made payable directly to the selling shareholders on behalf of the corporation. Clark neither examined nor handled the checks. After the checks were distributed, Beulah Pulliam's attorney produced a document he had drafted, entitled "stock purchase agreement." That document named as buyer of the stock "Clark D. Pulliam, *213 individually," and provided for the purchase of 800 shares of stock at $220 per share, plus $17,600 in interest. The document also recited the following: 2. Paragraph 415-11 of the Professional Service Corporation Act provides that no corporation organized under the Act may issue its capital stock to individuals not licensed or legally authorized to render the specific professional services or related professional services as those for which the corporation is organized (such services being funeral services in this instance). 3. Buyer is a duly licensed funeral director and is the only party hereto who is authorized to render funeral services. 4. By Item Third of his Last Will and Testament (the Will) duly admitted to probate * * * on August 30, 1976, Troy L. Pulliam, Jr., made specific bequests of the capital stock of the Corporation; anticipated that Beulah R. Pulliam the Optionees [sic] could not legally own said stock; further provided for an "option" of indefinite duration whereby Beulah R. Pulliam and the Optionees could purchase a proportionate ownership of the corporation; and a method by which the value of said stock was to be determined after his death and upon the exercise *214 of the "options" if, and when, Beulah R. Pulliam and one or more of the Optionees became licensed funeral directors. 5.Beulah R. Pulliam is desirous of forever surrendering all rights and claims to any interest (including the ownership of any of its capital stock) in the corporation. 6. Buyer is desirous of purchasing all the 800 shares of capital stock not bequeathed to him under the Will and Optionees are desirous of surrendering all of their present rights to such shares granted to them by the terms of the Will. Clark signed his name to the document. In addition, Clark signed three documents entitled "option agreements," relating to the options of Karen, Brent and Scott to purchase shares of the corporation in the event that they became licensed funeral directors. Clark was designated as the "seller" in these documents. Although Clark was familiar with the titles of the documents, and inserted the date and the optionees' names in the "option agreements," he did not read the terms of the documents. Clark's attorney did, however, receive copies of the documents before the March 27 meeting. As of the March 27 meeting, the corporation had not issued printed stock certificates to *215 represent the shareholders' interests. Sometime after the meeting, printed certificates were ordered. Shortly after receiving the certificates, Clark signed a document entitled "assignment," which assigned 800 shares of stock purchased by Clark to the corporation, in exchange for the corporation's assumption of "the indebtedness of said Clark D. Pulliam for the purchase of said stock." In addition, corporate minutes were prepared, which "[a]uthorized said corporation to pay all of the costs and expenses incurred in the transfer of the capital shares of the stock of said corporation from the estate of Troy L. Pulliam, Jr. to Clark D. Pulliam, including attorneys' fees and accounting fees." OPINION At his father's death, petitioner Clark Pulliam was a funeral director and an embalmer in the business he had worked in at various capacities since he was a child. In an attempt to be scrupulously fair both to petitioner and to his second family, Troy Pulliam left complicated instructions for the division of his business at death. The tension often inhering in these circumstances was aggravated by the faithful attempt of all concerned to adhere to these instructions as closely as possible. *216 After the division, petitioner became the owner of the business, a business now carrying a substantial debt from buying out the other heirs and missing the experience and good will of Troy Pulliam. Petitioner, a little more than a year beyond his apprenticeship, continued to conduct the business--now carrying a substantial debt that he personally guaranteed. Respondent determined tax deficiencies on the theory that the division of the family business at Troy's death occasioned dividends to petitioner taxable as ordinary income. We disagree for the reasons set out in this opinion. While the facts are in conflict, the applicable law is clear. If the corporation satisfied Clark's personal obligation when it allowed the proceeds of its loan from the bank to be paid to Beulah, Karen, Brent and Scott Pulliam, the satisfaction of that obligation would constitute a constructive dividend to him to the extent of the corporation's earnings and profits. Wall v. United States,164 F.2d 462 (4th Cir. 1947); see sections 301, 316 and 317. [2] If, on the other hand, Clark was not personally obligated when the payment was made, the transactions would impose no income tax consequences upon him. *217 Edenfield v. Commissioner,19 T.C. 13 (1952). As we stated in Bennett v. Commissioner,58 T.C. 381, 385 (1972), "[t]he issue is basically factual." Generally, a corporate payment for the stock of other shareholders does not affect the tax liability of the remaining shareholder. The law is well settled, however, that when a shareholder previously had been bound to pay for the stock himself, the corporation's payment of his obligation is taxed as the equivalent of a corporate distribution to him, and will generally be taxed as a dividend to the extent of the corporation's earnings and profits under sections 301, 316 and 317. E.g. Wall v. United States,supra.This rule derives from the principle of Old Colony Trust Co. v. Commissioner,279 U.S. 716 (1929), that having one's liabilities satisfied by another is equivalent to receiving cash for income tax purposes. The rule, therefore, is that a shareholder who was subject to a binding personal obligation to buy the stock is deemed to have received a corporate distribution when the corporation pays instead, while a shareholder *218 who was not so obligated is not affected by the corporate purchase. Compare Wall v. United States,supra with Edenfield v. Commissioner,supra. This essentially factual inquiry focuses on whether the personal obligation existed when the purchase occurred. Bennett v. Commissioner,supra.
We think it clear that Clark had not incurred personal liability at the time of the corporate stock purchase. He was under no obligation, either oral or written, when the corporation paid the shareholders. If, at the last minute, he had refused to go through with the transaction, the selling shareholders would not have had an enforceable personal claim against him. [3] *219 Accordingly, this case is closest to the facts involved in Bennett v. Commissioner,supra. There, the corporation paid funds to the remaining shareholder, who immediately paid the selling shareholder for the value of his stock. The remaining shareholder had previously made no commitment to pay for the stock personally, and we found that: Had petitioner declined at the last minute to go through with the transaction, we do not think Jones [selling shareholder] would have had any enforceable personal claim against petitioner for the agreed redemption price. Petitioner neither signed any agreement nor made any order commitment personally to pay for the stock. * * * [Bennett v. Commissioner,supra at 386.] The facts before us do not fit within the line of cases that commences with Wall v. United States,supra.Wall held that a corporation's payment to a shareholder was essentially equivalent to the payment of a dividend to the remaining shareholder (Wall) where, two years prior to the corporate payment, Wall had *220 contracted to purchase the stock on an installment basis, and had personally made the initial payments. Wall v. United States,supra.The Circuit Court refused to treat the two separate transactions as a corporate redemption, stating: [T]he effect of the two transactions is not identical to the situation that would have arisen had the stock been purchased directly by Rosedale [the corporation], for in that event no personal obligation would have been incurred by Wall. As it actually was, he did incur such an obligation to Coleman, and it is precisely the payment of that obligation by Rosedale which constitutes income to him. [Wall v. United States,supra at 466 (Emphasis added).] Subsequent cases that reached the same result also involved corporate payments occurring well after the shareholder became personally bound to buy the stock. In Sullivan v. United States,363 F.2d 724 (8th Cir. 1966), the shareholder signed an agreement in 1948 promising to purchase the stock of another shareholder if that shareholder's employment was terminated. Eight years later, in 1956, the shareholder announced his intention to leave the firm. The corporation's payment for the stock was found to have *221 relieved the remaining shareholder of an unconditional personal obligation to buy the shares, and, as such, was taxable to him as a dividend. Likewise, a shareholder who borrowed money from a corporation in order to buy the stock of another shareholder was held to have received the equivalent of a dividend when, four years later, the corporation canceled the obligation to repay the loan, and redeemed the shares. McGinty v. Commissioner,38 T.C. 882 (1962), affd. 325 F.2d 820 (2d Cir. 1963). In affirming, the Circuit Court of Appeals noted the importance of the interlude between the shareholder's purchase and the corporation's cancellation of the obligation: Although taxpayer testified that the redemption was intended to be carried out at the same time as the purchase, and introduced certain corporate records to support his claim, the proof was not of such overwhelming character as to compel a finding of fact which the Tax Court did not make -- that the two transactions were part of a single plan. [McGinty v. Commissioner,325 F.2d 820, 822 (2d Cir. 1963) (Emphasis added).] In Stephens v. Commissioner,60 T.C. 1004 (1973), affd. without published opinion 506 F.2d 1400 (6th Cir. 1974), *222 the corporation paid the departing shareholder several days after the remaining shareholder's offer to purchase the stock had been accepted, and in Yelencsics v. Commissioner,74 T.C. 1513 (1980), the corporation began to make payments one year after the shareholder signed a note creating personal liability. We decline to recharacterize this transaction as on in which Clark personally undertook to buy the stock, and then subsequently had the corporation meet his obligation. The evidence is sufficient to convince us that the corporation was not acting on Clark's behalf in paying the selling shareholders. Of great significance is the fact that the corporation had compelling reason to purchase the stock itself. Compare Yelencsics v. Commissioner,supra. It was the corporation, and not Clark, who received a letter from the state warning that its licensure was in question because the stock appeared to be held by people who were not licensed funeral directors. The Illinois statute at issue does not attempt to control the conduct of shareholders, but rather demands compliance from the corporation itself: No [professional service] corporation * * * may issue any of its capital stock to *223 anyone other than an individual who is duly licensed or otherwise legally authorized to render the same specific professional services or related professional services as those for which the corporation was organized. * * * [Ill. Ann. Stat., ch. 32, sec. 415-11 (Smith-Hurd 1983).] The promissory note issued by the corporation to the bank moreover states that the corporation's purpose for borrowing money was to enable it to "purchase stock in the corporation," and not to give the money to a shareholder so that the shareholder could purchase the stock. The corporation instructed the bank to pay the loan proceeds directly to the selling shareholder, so that, until Clark subsequently signed the stock purchase agreement, the transaction appeared in every way to be a corporate redemption of shares. The note was signed by the corporation, was secured by the corporation's property and was ultimately paid by the corporation. Clark could not have personally financed the purchase, and, as in Bennett v. Commissioner,58 T.C. 381 (1972), the selling shareholders knew this. As in Bennett v. Commissioner, the sale could not have occurred until the corporation obtained funds to make the payment. *224 The stock certificates, which were not yet issued on the date of the purchase, were turned over to the corporation shortly after Clark received them, all of these events occurring in a short contemporaneous time span. These facts corroborate our firm conclusion that Clark was a witness of unimpeachable integrity who clearly related the truth during his testimony before the Court. Respondent asserts that in order for petitioners to escape constructive dividend treatment, they must present "strong proof" that the agreement labeling Clark as "buyer" represents neither the intent of the parties nor the economic reality of the transaction, citing Lucas v. Commissioner,58 T.C. 1022 (1972). While the strong proof rule is most commonly applied to determine the proper value to allocate to various assets upon the sale of a business, e.g, Major v. Commissioner,76 T.C. 239 (1981); Lucas v. Commissioner,supra, the rule has been applied to other agreements where the buyer and seller would logically take adverse positions. [4] See Miami Purchasing Service Corp. v. Commissioner,76 T.C. 818 (1981).In certain circumstances we have applied the rule to determine whether the remaining shareholder *225 was relieved of a binding liability upon a corporation's payment for the stock of other shareholders. Stephens v. Commissioner,60 T.C. at 1012. [5]
On the other hand, petitioner argues that the strong proof *226 rule has no application herein, that the parties did not bargain adversely over the tax consequences here involved, that for a variety of reasons adverse tax consequences did not exist, and that if they did the parties were blissfully unaware of them. Even more to the point, the documents as a whole (including the loan to the corporation, payment by the corporation, the issuance of the stock certificate, and the assignment of these shares to the corporation) when considered in light of the events that transpired are sufficiently in conflict to raise at least an ambiguity making application of the strong proof rule questionable. Cf. Smith v. Cimmissioner,82 T.C. 705, 714 (1984); Peterson Machine Tool, Inc. v. Commissioner,79 T.C. 72, 82 (1982), affd.     F.2d     (10th Cir. 1984). We need not resolve these thorny issues, for even assuming arguendo that the strong proof rule applies, we believe petitioner has carried his burden. When we examine the transaction, we seek not to determine the outward form that a transaction is designed to take, but rather to discover the type of transaction that the parties truly intended to effect. "[W]e are not bound by the parties' labels, but *227 only by the facts." Smith v. Commissioner,supra at 716. The facts in the record convince us that Clark did not intend to buy the stock in his individual capacity. The word "buy" is defined in Black's Law Dictionary, 4th ed. (1968) as "to acquire the ownership of property by giving an accepted price or consideration therefore; or by agreeing to do so." It is clear from the testimony that, when Clark was denied credit for a personal loan, he abandoned his intention of buying the stock himself. Rather, Clark and the selling shareholders intended for the corporation to incur the loan, and for the corporation to make all loan payments, all as part of a single plan. Moreover, Clark's subsequent conduct and his testimony lead us to conclude that he never intended "to acquire the ownership of" the purchased stock. By turning the stock over to the corporation as soon as he received the printed certificates, Clark was executing the transaction as he believed it had been planned: the corporation paid the Pulliams for their stock, and, when printed certificates were obtained, the corporation held them as treasury stock. We are convinced that both Clark and the selling shareholders expected *228 that the option rights would be exercised on the stock held by the corporation, and subsequent documents stating that the corporation held the stock "subject to the agreement" reinforces this conviction. When we look to the economic reality of the transaction, the case becomes very clear. The corporation paid the Pulliams for their stock, and in exchange received possession of the stock certificates, subject to the option agreements. The corporation made all payments on the note to the bank. It was the corporation, and not Clark, who stood to lose the state license if the sale did not take place. All physical conduct, from the manner in which the checks were issued and delivered to the sellers to the turning over to the corporation of the certificates when issued, was consistent with a corporate redemption, and not with a shareholder purchase.The agreements that identified Clark individually as the buyer and as the one obligated under the option agreements were drafted by the sellers' attorney, and did not reflect the actual transaction as contemplated and performed by the parties. Respondent argues in addition that the interest incurred by the corporation on its loan and deducted *229 on its income tax return is in fact deductible by Clark and not by the corporation, since the payment constituted a constructive dividend to Clark. Since we have found the payment did not constitute a constructive dividend to Clark, we hold that the corporation properly deducted the interest incurred on its obligation to the bank. Decisions will be entered for the petitioners.
Footnotes
1. Clark had retained an attorney by the name of Mark Weber to help him to negotiate the stock option arrangements. Mr. Weber played no role, however, with respect to the loan to the corporation, and did not attend the meeting at the bank during which the loan was executed.↩
2. Except as otherwise provided, all section references are to the Internal Revenue Code of 1954, as in effect in 1978.↩
3. Respondent concedes on brief that the will of Troy Pulliam, Jr. created no binding personal obligation on Clark's part. Respondent has also stated: If the continuing shareholder assigns his stock purchase contract to the redeeming corporation prior to the time when he incurs a primary and unconditional obligation to pay for the shares of stock, no distribution to him will result. * * * While a pre-existing obligation to perform in the future is a necessary element in establishing a distribution in this type of case, it is not until the obligor's duty to perform becomes unconditional that it can be said a primary and unconditional obligation arises. [Rev. Rul. 69-608, 1969-2 C.B. 42↩, 43 (Emphasis added.)]
4. In Wilson Athletic Goods Manufacturing Co. v. Commissioner,222 F.2d 355, 357 (7th Cir. 1955), revg. a Memorandum Opinion of this Court, the Circuit Court stated that "it was the duty of the Tax Court and is our duty here to ascertain the true intent, insofar as tax consequences are concerned. Consequently, it is immaterial whether the contract did or did not define a specified amount as the value of the covenant." In Major v. Commissioner,76 T.C. 239, 249↩ (1981), we stated "[i]n light of the preference in this Court to apply the strong proof standard as applied to the intention of the parties, we shall proceed on the basis that this is acceptable to the Seventh Circuit." We will proceed likewise herein. 5. If the corporation purchased the stock, the selling shareholders would have to meet the tests of section 302 in order to avoid dividend treatment. We will not speculate here regarding the tax consequences to the selling shareholders since they are not parties to this proceeding.↩